940 F.2d 660
 60 USLW 2176, RICO Bus.Disp.Guide 7818
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph F. McCOY, Otis A. Stump, Jr., Daris Stump, Plaintiff-Appellants,
v.
J.J.B. HILLIARD, W.L. Lyons, Inc., Hilliard-Lyons River
Management, Inc., Hilliard-Lyons Equipment
Procurement, Inc., Hilliard-Lyons
Equipment Management, Inc.,
Defendants-Appellees,
 No. 90-5532.
 United States Court of Appeals, Sixth Circuit.
 July 19, 1991.
 
 Before NATHANIEL R. JONES and SUHRHEINRICH, Circuit Judges, and FEIKENS, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiffs, Joseph F. McCoy, Otis A. Stump Jr., and Daris Stump, appeal from the order of summary judgment entered by the district court in favor of defendants, J.J.B. Hilliard, W.L. Lyons, Inc. ("Hilliard-Lyons"), and three of its wholly-owned subsidiaries, Hilliard-Lyons River Management, Inc. ("HLRM"), Hilliard-Lyons Equipment Procurement, Inc. ("HLEP"), and Hilliard-Lyons Equipment Management, Inc. ("HLEM"), in this action alleging: (1) violations of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) and 17 C.F.R. Sec. 240.10(b)-5(2); (2) violation of Title IX of the Organized Crime Control Act of 1970 ("RICO"), 18 U.S.C. Secs. 1961-1968; (3) common law fraud; and (4) breach of contract. Plaintiffs' allegations arise out of $17 million in damages allegedly suffered as a result of their purchase of jumbo covered hopper river barges as investments in 1981.
 
 
 2
 Plaintiffs Otis and Daris Stump argue that the district court erred: (1) in finding that they failed to establish a dispute of material fact with regard to the element of "reasonable reliance" under the federal securities and common law fraud claims; and (2) in finding that they failed to state a RICO claim as a matter of law because they had failed to show the continuity necessary to establish a "pattern of racketeering" activity. Plaintiff McCoy argues that the district court erred in summarily granting defendants' motions for summary judgment, without the benefit of a written opinion, since there are material facts at issue with regard to his RICO, federal securities, common law fraud and breach of contract claims. For the reasons stated below, we AFFIRM the district court's grant of summary judgment on the Stumps' and McCoy's RICO claims and McCoy's breach of contract claim. However, because we are unable to determine on this record for whom Harry Hadden was acting as an agent with regard to the purchase of barges, we REMAND this case for further proceedings with regard to plaintiffs' federal securities and common law fraud claims.
 
 I. FACTS
 
 3
 In 1978, Hilliard-Lyons began offering managed barge investment programs to its customers. The barges were sold either individually or through limited partnerships and operated as part of a "pool" of barges in which revenues and expenses were allocated on a pro rata basis among the various investors, without regard to the actual revenues or expenses of any given barge. Hilliard-Lyons arranged for the barge investment programs through a network of subsidiary corporations, also defendants herein, which were assigned specific sales or management tasks. By 1981, defendant HLEM had been formed for the purpose of arranging the construction and acquisition of the barges sold to investors, defendant HLEP had been formed for the purpose of procuring the barges and contracting with the investors for the purchase of barges, and defendant HLRM had been formed for the purpose of supervising the management of the river barges.
 
 
 4
 On June 30, 1981, Hilliard-Lyons commenced the private placement offering of a program called the "Hilliard-Lyons Barge Partners 1981-1," an offering which contemplated the sale of 68 limited partnership units in a partnership which would purchase 30 barges and barge covers. Harry Hadden, who was then employed as an investment broker by Hilliard-Lyons, sold seven of the limited partnership units to plaintiff Joseph McCoy, seven limited partnership units to Leonard McCoy, who is not a plaintiff herein, two limited partnership units to plaintiff Daris Stump, and two limited partnership units to plaintiff Otis A. Stump. The offering was withdrawn after the sale of some 60 limited partnership units, eight units short of their initial goal but sufficient to purchase 27 barges. Plaintiffs' complaint does not allege any cause of action based on these initial barge investments marketed as Hilliard-Lyons Barge Partners, 1981-1.[1]
 
 
 5
 By late summer of 1981, plaintiffs McCoy, Otis Stump, and Daris Stump inquired about the private purchase, as opposed to limited partnership share purchases, of barges. Hadden, apparently acting on behalf of plaintiffs, approached certain of defendants to ascertain whether they would be interested in putting together a private barge deal for plaintiffs. Although defendant subsidiaries had been previously involved in a small number of individual private barge transactions, the purchasers of the barges were either officers of Hilliard-Lyons or their friends and relatives. After some initial discussions by defendants, it was determined that such a transaction was feasible.
 
 
 6
 During the same time frame, the barge market suffered a significant downturn. On October 22, 1981, the president of HLEM sent a letter to McCoy apprising him of the adverse change in the market. On October 27, 1981, McCoy formally offered to purchase five jumbo hopper barges and entered into a "Purchaser's Representations and Undertakings and Subscription Agreement" ("Purchase Agreement"), with HLEP.
 
 
 7
 On November 11, 1981 HLEP sent a letter to the Stumps, indicating substantially lower projections in barge rates for 1982. The letter also contained revised projections to reflect the downturn in the barge market.
 
 
 8
 On November 15, 1981, the Stumps entered into a virtually identical agreement to that entered into by McCoy, offering to purchase two jumbo hopper barges. Also executed along with each plaintiff's Purchase Agreement was a management agreement with HLRM and a "construction agreement" with HLEP and Trinity Marine Marketing, Inc.
 
 
 9
 No offering memorandum or circular was presented to plaintiffs in connection with their individual barge purchases. Rather, the sales presentations were made through various materials including offering memoranda from previous Hilliard-Lyons barge investment programs, projections of barge revenues, written correspondence, oral presentations by Hadden, and the actual contract documents which were executed to effectuate the transactions. Although Joseph McCoy testified in his depositions that he read the written material that was presented to him in connection with his acquisition, both Daris Stump and Otis Stump admitted that, except for the written projections which were shown them, they did not read the Purchase Agreements or any of the written materials provided to them. Plaintiffs each testified that they relied heavily on the oral representations of Hadden in making their barge investments.
 
 
 10
 On November 23, 1981, Don Graeter, then the president of HLEP, wrote a memorandum expressing concern by both himself and Jim Fulp regarding the sale of barges to plaintiffs by Hadden. That memorandum, written to Hilliard-Lyons' employees Watson Dabney, Gil Pamplin, Bill Crawford, Halsey Sanford, and Jerry Martin, stated:
 
 
 11
 As all of you are aware, we have been having discussions with Harry Hadden for several months regarding a private barge transaction for some of his customers before the end of 1981. As most of you are also aware, Jim Fulp and I have been strongly opposed to consummating this transaction for the last month or so because of some negative developments in the barge freight market. Since we were so instructed, we have proceeded with this transaction to date, despite our personal concerns. Because of our continuing concern about this entire situation and its possible future ramifications regarding our relationship with Harry and with his customers, Jim and I feel that this memorandum should be prepared to put the situation on record and in writing.
 
 
 12
 The following is a brief restatement of the facts to date:
 
 
 13
 1. We began discussing a small private program with Harry in late summer and began preparing projections for him to analyze the program.
 
 
 14
 2. In mid-October, the barge freight market took a substantial turn for the negative. After learning of this through conversations with officials at Memco in late October, we transmitted this information to Harry. At that time, Harry had only discussed the program extensively with Joseph McCoy who had agreed to go forward on 5 barges. However, we had not reached the point of no return for that particular transaction.
 
 
 15
 3. Discussions led to a meeting in Louisville with Harry, Jim, myself and Bill Crawford. We again reviewed the situation with Harry and expressed our feeling that the program should be terminated in light of market conditions. Harry responded that he wished to go forward, anyway, since his client understood all the risks involved and could financially bear the risk in light of the excellent tax attributes of the investment. Harry stated that he wished to sell the program to certain other people as well as Joseph McCoy. In light of this we established quite rigorous financial guidelines for anyone Harry wished to show the program to and agreed that we would expand upon the documentation since Harry was planning to involve others besides Mr. McCoy.
 
 
 16
 4. After the meeting with Harry, the freight market deteriorated further, generating stronger opinions on the part of Memco officials regarding the inadvisability of acquiring new barges at this particular time. In light of this, we reiterated our concerns that the transaction not be consummated, even with Joseph McCoy. Nonetheless, we were advised to go forward as long as all the risks had been set out in writing.
 
 
 17
 5. Before we had finalized the new sets of documents for Harry's customers, Ernst & Whinney changed the advice which it had given us on three previous occasions regarding the precise impact of the new 1981 tax act on 1981 depreciation for barges, reducing the write-off for 1981. This information was transmitted to Harry by telephone and appropriate warnings were added to the financial projections in the new documents. Harry still insisted on going forward.
 
 
 18
 6. Today, Memco officials called and advised us that they had been rethinking their future planning over the weekend and did not wish to take on management of any additional barges other than the 5 already consummated with Joseph McCoy.
 
 
 19
 The concerns which Jim and I have are as follows:
 
 
 20
 1. We continue to believe that a new barge is not a wise investment at this particular time. We believe anyone considering a barge as an investment for the long term should wait until after the first of the year when he could probably negotiate a much more attractive price with the shipyard. In the alternative, we believe that there will be some very attractive prices available next year in used barges. We both have a philosophical problem with consummating an investment with someone which we would not recommend ourselves.
 
 
 21
 2. While all of the materials have been updated with the most recent developments disclosed, this does not give us complete comfort, particularly in this situation. First, many investors executed documents indicating that they understand a variety of risks but later assert a lack of understanding when some of the risks come to pass. Accordingly, we think there is a substantial risk that, if next year proves to be as rough as it now appears, that Harry's investors will be unhappy both with the firm and with him. Second, when we revised the 1982 projections to $50 per day with an explanation that this assumed no earnings during the first half and $100 per day for the second half, Harry called to chastise us for preparing numbers that he believed to be too low based on his feelings as to what earnings would be for 1982. This caused us to wonder whether or not Harry really absorbed our conversation in Bill Crawford's presence and whether or not the substance of that conversation was passed on to his customers.
 
 
 22
 3. In recent weeks, Harry has been almost frantic to have us pay out his finder's fee on Joseph McCoy's 5 barges. Harry says he badly needs the cash for other investments of an unspecified nature which he has made personally. We have told Harry that we cannot pay out any compensation to any of the parties involved until the barges have been delivered, since the entire transaction is contingent upon delivery prior to year-end. Despite this, Harry has called three times today to demand his check on these barges. This gives us the following concerns:
 
 
 23
 A. Harry is an investor in the 1981-1 barge partnership. In order to get the bank to approve his loan application, the firm had to provide a gentlemen's agreement to stand behind this loan. The program is structured so as to require several additional substantial cash contributions, the next being for $25,000 in February. If Harry is desperate for the cash on the McCoy barges, we are concerned as to whether or not he will be able to handle the obligations regarding the 1981-1 partnership and the firm's possible exposure if he is not.
 
 
 24
 B. Since Harry seems to be in a personal squeeze for cash, we are concerned as to whether or not the documents we have prepared for his customers regarding this private program have been adequately conveyed to the customers who we understand rely very heavily on Harry's recommendations.
 
 
 25
 C. To make matters worse, Harry is proposing to split a private barge with one of his customers. A barge investment requires a person with a great deal of liquidity, a standard Harry would not seem to meet.
 
 
 26
 4. While it has been unfortunate that circumstances have changed on three occasions during our discussions of this program, Harry has evidenced a lack of understanding and some hostility regarding the two prior changes, and we anticipate that this will be repeated regarding the phone call which we received from Memco today. On the two prior occasions, Harry accused Jim and I of having intentionally misled him when we explained what happened. In each case, this led to a call to Bill Crawford from Tom Kessinger. We would anticipate that yet another call will be forthcoming regarding Memco's refusal to take on additional barges and we feel that all of you should be prepared for this.
 
 
 27
 Upon instruction, we have consummated the arrangement with the shipyard regarding the 5 original barges with Joseph McCoy after our concerns were raised verbally. However, we remain deeply concerned about a variety of aspects regarding this whole situation and submit this memorandum because we feel that the dollars involved and the importance of Harry and his customers to the firm, not to mention the firm's possible obligations regarding Harry's borrowings, are of sufficient importance that things should not go further in this regard without all of us having had the benefit of written communication.
 
 
 28
 Plaintiffs received periodic reports from HLRM in reference to the operations of the barges and, from time to time, they were required to make contributions toward the cost of management and operation of the barges. However, plaintiffs claim it was not until they received a memorandum from HLRM, dated March 28, 1983, transmitting a report from MEMCO dated March 3, 1983, that they had reason to believe that their investment in the barges were not as represented.
 
 
 29
 The MEMCO report pointed out several causes for the dramatic downturn in the barge industry, such as high interest rates, high exchange rates, alienation of foreign customers, a recession, and competition from railroads. After reviewing its conduct in the operation of the various barge pools under its management and its efforts to maintain and increase the earnings so that it would not be necessary to go to the owners for additional working capital, MEMCO made the observation that "the prospects for cash flow back to the investors are not very promising" and further noted that there was no market for used barges with sales thereof being made at distressed prices.
 
 II. PROCEDURAL HISTORY
 
 30
 On December 31, 1985, plaintiffs Joseph McCoy, Otis Stump and Daris Stump filed a complaint and, on January 17, 1986, an amended complaint against defendant Hilliard-Lyons and its subsidiary corporations HLRM, HLEP and HLEM alleging: (1) violations of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) and 17 C.F.R. Sec. 240.10(b)-5(2); (2) RICO violations under 18 U.S.C. Secs. 1961-68; (3) common law fraud; and (4) breach of contract.
 
 
 31
 On July 13, 1987, the district court stayed the proceedings with regard to plaintiff McCoy's complaint against defendant Hilliard-Lyons pending arbitration before the American Arbitration Association ("AAA").[3] On March 21, 1988, the arbitration panel rendered a decision denying each and every claim made by McCoy against Hilliard-Lyons. In accordance with AAA's practice, no written opinion was issued. McCoy did not appeal the AAA's decision which is now final and binding on the parties.
 
 
 32
 Just prior to the AAA decision, the defendants' had filed their motion for summary judgment with regard to the Stumps' amended complaint. Eight days after the AAA decision on March 31, 1988, the district court entered a memorandum opinion and order dismissing Daris Stump's and Otis Stump's amended complaint on the grounds that: (1) the Stumps had failed to state a RICO claim as a matter of law since they had not shown the "continuity" necessary to establish a "pattern of racketeering activity;" and (2) the Stumps had presented no triable material facts indicating that they had reasonably relied on any alleged misrepresentation or omission, thus warranting dismissal of their securities claims under section 10(b)/rule 10-b(5) and their common law fraud claims. Prior to the court's opinion, the Stumps had voluntarily dismissed their breach of contract claims against defendants.
 
 
 33
 On August 17, 1988, the remaining defendants in this action, HLRM, HLEP, and HLEM, filed a motion for summary judgment with regard to remaining plaintiff McCoy's claims. On January 29, 1990, the district court entered an order without the benefit of a written opinion, granting defendants' motion for summary judgment and dismissing McCoy's amended complaint. On March 12, 1990, the court entered a final appealable judgment dismissing the complaint and amended complaint of plaintiffs Joseph McCoy, Daris Stump and Otis Stump with prejudice.
 
 III. STANDARD OF REVIEW
 
 34
 We review a court's grant of summary judgment under Fed.R.Civ.P. 56 de novo. See E.E.O.C. v. Univ. of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 IV. ANALYSIS
 A. RICO Claims
 
 35
 The district court concluded that plaintiffs failed to sufficiently plead a "pattern of racketeering" activity under RICO. As defined in 18 U.S.C. Sec. 1961(5) (1988), a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." In H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. ----, 109 S.Ct. 2893 (1989), the Supreme Court made it clear that proof of a "pattern of racketeering" requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. at ----, 109 S.Ct. at 2900 (emphasis in original); see American Eagle Credit Corp. v. Gaskins, No. 89-2237 (6th Cir. November 30, 1990).
 
 
 36
 In this case, defendants sold or participated in the sale of five (5) barges to McCoy in October 1981 and one (1) barge each to Otis and Daris Stump in November, 1981. There is no assertion that any further purchases were contemplated by the parties. Nevertheless, plaintiffs argue that the "Management Agreement" contemplated a long term relationship between the parties, thereby giving rise to a threat of "continued criminal activity." We disagree. The fraud alleged here concerned the inducement to purchase barge investments. The criminal activity, then, included all the activities leading up to and including the execution of the Purchase Agreements, not the implementation of the terms of that or other collateral agreements. Because defendants' sale of seven (7) barges to the plaintiffs over no more than a one month period does not constitute a "pattern of racketeering," plaintiffs RICO claims were properly dismissed as a matter of law.
 
 B. McCoy's Breach of Contract Claim
 
 37
 McCoy's claim that the defendant subsidiaries breached the Management Agreement entered into between McCoy and HLRM. Specifically, McCoy contends that the defendant subsidiaries failed to have the barges properly "surveyed and accepted" on his behalf and, consequently, accepted delivery of two barges which were of "inferior quality."
 
 
 38
 A breach of contract occurs when a party to the agreement fails, without legal excuse, to perform a promise which forms a whole or a part of the contract. See Dulworth v. Hyman, 246 S.W.2d 993 (Ky.1952). Thus, in order to succeed on his claim, McCoy must prove (a) that there was a contract between him and the defendant subsidiaries, and (b) that there was a material breach of the contract terms by such defendant subsidiaries. See, e.g., Fannin v. Commercial Credit Corp., 249 S.W.2d 826, 827 (Ky.1952). The record here shows that McCoy cannot, as a matter of law, establish the elements necessary to support his claim.
 
 
 39
 It is undisputed that the only parties to the Management Agreement are McCoy and HLRM. Neither HLEM or HLEP are even named in the agreement and, thus, could not have been under any contractual obligation to supervise the construction of the barges. Having failed to establish the very existence of a contract with HLEM or HLEP, McCoy's claims against them for breach of contract must be dismissed.
 
 
 40
 With regard to McCoy's claim against HLRM, no evidence has been offered that HLRM failed to properly "survey or inspect" the barges as required under the agreement. McCoy has offered evidence indicating that, seven years after delivery of the barges, an inspection revealed that certain of the barge compartments could require rewelding "a year or two down the road." However, HLRM did not "warrant" the barges against defects or design flaws. HLRM contracted to inspect the barges and have them surveyed, an obligation it fulfilled when, in compliance with industry practice, HLRM employed MEMCO to conduct the inspection and received a report from MEMCO indicating that the construction had been satisfactorily performed.
 
 
 41
 Finally, McCoy argues that the barges were not delivered until after December 31, 1982, the date upon which delivery was supposed to take place under the contract. McCoy contends that HLRM was obligated under the contract to pursue all claims on behalf of McCoy for matters concerning the barges. A review of plaintiff's amended complaint, however, reveals that no such allegations or claim appears therein. Thus, McCoy's breach of contract claim was properly dismissed as a matter of law.
 
 C. Federal Securities Claim
 
 42
 Before plaintiffs may plead and prove a violation of section 10(b)/rule 10-b(5), they must establish that their purchase of barges constitute "investment contracts" and, thus, "securities" under the Securities Act. A contract is considered an "investment contract" for the purposes of the Securities Act if it is (1) a contract transaction or scheme whereby a person invests his money; (2) in a common enterprise; and (3) is led to expect profits from the "undeniably significant" efforts of the promoter or a third party. See Securities Exchange Comm'n. v. Howey Co., 328 U.S. 293, 298-99 (1946); United Housing Foundation, Inc. v. Foreman, 421 U.S. 837, 852 (1975). In distinguishing securities transactions from other commercial dealings, courts must focus on the "economic realities" of the transaction. See Union Planters Nat. Bank v. Commercial Credit Business Loans, Inc., 651 F.2d 1174, 1181 (6th Cir.1981).
 
 
 43
 Defendants argue that the third element set forth above, reliance on the efforts of third parties, has not been established in this case. Specifically, defendants contend that plaintiffs retained ultimate control over the barges since they were not contractually required to chose HLRM as the company to manage their barges and, under the terms of the contracts ultimately entered into between plaintiffs and HLRM, could cancel the management agreement upon 45 days notice at the end of each twelve month period. Two Eighth Circuit cases, which offer perhaps the most restrictive definition of "investment contract" of all other published opinions, have held that the retention of such power under similar management contracts normally precludes a finding that a securities contract was at issue. Schultz v. Dain Corporation, 568 F.2d 612, 615 (8th Cir.1978); Fargo Partners v. Dain Corp., 540 F.2d 912, 915 (8th Cir.1976). However, both cases acknowledged that a different result might be reached in a case where "a small investor must rely on the seller's efforts because he lacks business knowledge, finances or control over the operations." Schultz, 568 F.2d at 616; Fargo Partners, 540 F.2d at 915. Other factors which have been held significant in determining whether profits are dependent on the "undeniably significant" efforts of others are: the nature of the product being sold; the character of the sales agency; and the nature of industry to be served. These factors all bear on the broader issue of whether the contractually retained powers by the investor might realistically be exercised or, to the contrary, were merely inserted in the contract by the seller to avoid the application of securities laws. See S.E.C. v. Aqua-Sonic Products Corp., 524 F.Supp. 866, 878 (S.D.N.Y.1981).
 
 
 44
 In this case, plaintiffs have introduced probative evidence indicating that there was no realistic expectation that they would exert any control over the barge, including that: the barge investments were marketed by Hilliard-Lyons and offered by defendants as "securities" as that term is used under the Securities Act; plaintiffs, although successful businessmen, were neither sophisticated investors nor had any specialized knowledge of the barge market; plaintiffs did not live near or have businesses near the area in which the barges would be operating; plaintiffs had no real interest in the operation of the barges since the motivating factor behind the investment was to provide a depreciation deduction under the tax code; the investment was attractive based on the "pooling" of barges with other investors so that revenues and expenses were absorbed by large numbers of investors and management was centralized; HLRM's "pooling" agreements required centralized control and management which could only realistically be supplied by HLRM; and the managing of barges, unlike the apartment buildings at issue in Schultz and Fargo Partners, was somewhat specialized.
 
 
 45
 In view of the broad and flexible approach which we must employ in determining whether the sale of an asset is an "investment contract," we find that the barge investments in this case were offered as "securities" within the meaning of the Securities Act.
 
 
 46
 D. Reasonable Reliance Under Section 10(b)/rule 10-b(5) and Common Law Fraud
 
 
 47
 An essential element under either the Security Act or for common law fraud, is the reasonable reliance by the plaintiffs on the alleged misrepresentations and/or material omissions for which defendants are responsible. Chelsea Assoc. v. Rapanos, 527 F.2d 1266, 1271 (6th Cir.1975); Shores v. Sklar, 647 F.2d 462, 468 (5th Cir.1981). Section II(e) of the Barge Purchase Agreement stated that plaintiffs had not relied upon any information not listed in the Purchase Agreements. Defendants argue that plaintiffs are, therefore, precluded from contending that they relied on the alleged oral representations of Hadden. Plaintiffs argue that under Section II(d) of the agreement, they were allowed to rely on the representations of Hadden. Section II(d) states that plaintiffs had the opportunity to have answered any questions concerning the investment and that all of their questions had been answered satisfactorily.
 
 
 48
 We agree with plaintiffs that Section II(d) allows for reliance on the oral representation of Hadden. Furthermore, without even considering the other evidence in this record, Don Graeter's November 23, 1981 memorandum demonstrates that HLEP at least suspected that Hadden was falsely representing the barge investments to the plaintiffs and, furthermore, failed to disclose important information to plaintiffs concerning the conditions then existing in the barge market. If Hadden was acting within the scope of his employment as an agent for one or more of the defendants, then plaintiffs will have sustained their burden of establishing triable material facts necessary to defeat a motion of summary judgment on the fraud and securities claims. Unfortunately, the district court made no specific finding of an agency relationship between Hadden and any of the parties with regard to the private barge purchases. Furthermore, this record contains conflicting evidence with regard to whether Hadden was acting as an agent for the plaintiffs or one or more of the defendants.
 
 
 49
 We decline to resolve the agency issue in the first instance on appeal. Thus, this case is REMANDED for further proceedings consistent with this opinion with regard to plaintiffs' securities and common law fraud claims.
 
 
 
 *
 The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Defendants contend that prior to purchasing their limited partnership units in Hilliard-Lyons Barge Partners, 1981-1, plaintiffs had each been provided a prospectus containing projections prepared by Marine Equipment Management Corporation of St. Louis ("MEMCO"), the Company responsible for the day-to-day operation of the barges. This prospectus allegedly warned of the high risk nature of the investment. However, defendants have not included the prospectus (R. 83, Exhibit 1) or a June 30, 1981 letter from MEMCO to investors (R. 66, Exhibit 2) in the Joint Appendix. Such evidence would go to show that plaintiffs had prior knowledge of the risks involved in the purchase of barges
 
 
 [3]
 McCoy and Hilliard-Lyons entered into a mandatory arbitration agreement in a contract entitled "Customer Agreement." Pre-trial proceedings continued with regard to the Stumps' claim against Hilliard-Lyons and its subsidiaries HLRM, HLEP and HLEM