# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 2, 2002 Session

## JOHN T. KING v. ANNE B. POPE

**Appeal by permission from the Court of Appeals, Middle Section**
**Chancery Court for Davidson County**
**No. 99-3550-III    Ellen Hobbs Lyle, Chancellor**

---

**No. M2000-02127-SC-R11-CV - Filed December 19, 2002**

---

In this case, we must decide whether a pay telephone sale-leaseback program marketed and sold by the plaintiff constitutes an investment contract, and thus a security under the Tennessee Securities Act of 1980. In finding that the program was a security, the trial court applied the definition of "investment contract" adopted by the Court of Criminal Appeals in State v. Brewer, 932 S.W.2d 1 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1996). Under this test, an investment contract exists where

> (1) An offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

Brewer, 932 S.W.2d at 11 (quoting State v. Hawaii Market, 485 P.2d 105, 109 (Haw. 1971)).

The Court of Appeals rejected the Brewer test and instead adopted the federal test for determining whether a particular transaction is an investment contract. See United Hous. Found., Inc. v. Forman, 421 U.S. 837 (1975); SEC v. W.J. Howey Co., 328 U.S. 293 (1946). Applying this test, the Court of Appeals held that the pay telephone sale-leaseback program at issue in this case is not a security. After careful consideration, we agree with the trial court's finding that the appropriate test for determining the presence of an investment contract is set forth in Brewer. Applying this test, we agree with the trial court that the plaintiff's payphone sale-leaseback program is an investment contract and that the plaintiff was thus marketing and selling unregistered securities in violation of Tennessee law.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed**

FRANK F. DROWOTA, III, C. J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and WILLIAM M. BARKER, JJ. joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Janet M. Kleinfelter, Senior Counsel, Nashville, Tennessee, for Appellant, Anne B. Pope, Commissioner of the Tennessee Department of Commerce and Insurance.

R. Louis Crossley, Jr., Knoxville, Tennessee, and W. Davidson Broemel, Nashville, Tennessee, for Appellee, John T. King.

## OPINION

### Factual Background

In February 1994, the plaintiff, John King, a registered securities agent and president of Capital Investments, Inc. ("CII"), began offering and selling to Tennessee residents a pay telephone sale-leaseback program for Quarter Call, Inc. ("QCI"), a company that provided discount pay telephone long distance service to all fifty states, at the rate of twenty-five cents per minute. The program was comprised of three documents, all of which were executed by participants simultaneously: a purchase agreement, a telephone lease-agreement, and an option to sell agreement. Participants first signed the purchase agreement to buy a minimum of three pay telephones from QCI, at a price of $4,995 per phone, with $495 of that amount applied toward the purchase of a performance bond from American Diversified Insurance Company ("ADIC"). The purchase agreement provided that the telephones would be delivered to QCI's home office in Bethesda, Maryland.

Participants next executed a telephone lease-agreement whereby they leased the pay telephones back to QCI for a term of sixty months. QCI agreed to pay participants $75 per month per telephone for the term. Participants did not receive any right under the lease agreement to any percentage of the revenues or profits generated through operation of the pay telephones. In addition, participants did not share in the losses. QCI agreed to pay all costs associated with using the telephones, including expenses of repair, taxes, and insurance. QCI further agreed to indemnify the participants against any and all loss, damage, liability, and expense associated with the pay telephones. While the lease agreement provided that "the equipment shall at all times be under the sole and absolute control of QCI," participants were entitled to notification of their telephones' exact location within ten business days of the time the telephones had been installed. The lease agreement afforded participants the right to terminate the lease upon sixty days notice and payment of a termination fee. However, QCI was not required to accept more than 100 early terminations during any sixty-day period.

The final document participants executed was an option to sell agreement whereby they were given the option to sell the pay telephones back to QCI at any time so long as specified notice was given: To sell at the end of the lease term, 180 days notice was required. To sell prior to the lease's expiration, sixty days notice was required. Upon receiving the appropriate notice, QCI agreed to purchase participants' pay telephones for $4500 each, less any applicable early termination fee.

QCI and King used promotional literature, containing a number of representations, to market and advertise the program to the general public. Promotional literature indicated that QCI chose the locations for the pay telephones and supplied advertising and marketing of the payphone service to the general public. Materials included a letter from QCI President Glenn Kendall, stating the following:

> I assume you are interested because you are fed up with 3% or 4% returns on your savings; or, maybe you are uncomfortable with risking your money in the stock market?
>
> Whatever the reasons for your interest, you are about to learn how, by buying and leasing pay telephones, you can receive......
>
> • *An 18% net*, fixed annual return on your money.
>
> • *Fully guaranteed income.* Your returns are insured through a faithful performance bond from American Diversified Insurance Company.
>
> • *Monthly returns.* You receive a check every month for 60 consecutive months.
>
> • A high degree of *liquidity.* You may withdraw all or part of your money prior to the full term!
>
> • Substantially *tax sheltered income* (IRS Section 179). See your tax advisor.
>
> • *Security.* You actually hold title to a valuable asset and always know where it is located.
>
> • *Insurance.* Your equipment is insured at 100% of its value.
>
> • *A successful, growing company.* QCI has grown tremendously due to increasing consumer demand for the QCI discount payphones which enable callers to call all 50 states (including Alaska and Hawaii) for just 25 [cents] per minute.

Admin. R. at 64 (emphasis in original). Additionally, QCI described the nature of the sale-leaseback program as "a very common and legal method by which corporations may quickly raise money for capital expenditures and expansion, without sacrificing equity in the company."

On March 22, 1994, less than two months after King began advertising and marketing this program, the Commissioner of the Department of Commerce and Insurance ("Commissioner") issued a cease and desist order against King and CII, on the basis that the QCI sale-leaseback program was a security as defined in the Tennessee Securities Act of 1980 ("the Act"), that the program had not been registered as a security, and therefore, that King and CII had violated the Act by selling this unregistered security. Thereafter, the Securities Division of the Department of Commerce and Insurance filed a complaint seeking to revoke King's registration as a securities agent for violating the Act. King's response denied all allegations and requested a contested case hearing under the Uniform Administrative Procedures Act. Following a pre-trial conference, the parties stipulated as to the facts and submitted briefs on the issue of whether the QCI sale-leaseback program was a security under Tennessee law. The Administrative Law Judge, applying the test adopted in State v. Brewer, 932 S.W.2d 1 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1996),

concluded that the sale-leaseback program was a security. The Commissioner issued a final order adopting the findings and conclusions of the Administrative Law Judge and directing that King's license be revoked.

King filed a petition for judicial review in the Chancery Court of Davidson County. See Tenn. Code Ann. § 4-5-322 (1999). The chancery court held that the Hawaii Market test adopted in Brewer is the appropriate test to apply to determine if the sale-leaseback transaction was an investment contract. Applying this test, the Chancellor upheld the Commissioner's decision revoking King's license for selling unregistered securities in violation of state law.

King appealed, and the Court of Appeals reversed. In so doing, the intermediate court rejected the test adopted in Brewer and held that the federal Howey-Forman definition for "investment contract" is the appropriate test to apply in Tennessee when determining whether a transaction constitutes an investment contract. The Court of Appeals found that the QCI sale-leaseback program was not an investment contract because it lacked the "common enterprise" element. Therefore, the Court of Appeals held that King's license should not be revoked for selling unregistered securities.

We granted the Commissioner's application for permission to appeal and now reverse the judgment of the Court of Appeals.

## Standard of Review

Resolution of the issues before this Court hinges on the interpretation of Tennessee Code Annotated section 48-2-102(12) and the application of that law to the facts of the case. "Construction of a statute and its application to the facts of a case are issues of law." Patterson v. Tennessee Dept. of Labor and Workforce Dev., 60 S.W.3d 60, 62 (Tenn. 2001) (citing Beare Co. v. Tennessee Dept. of Revenue, 858 S.W.2d 906, 907 (Tenn.1993)). "The review of a question of law is de novo, with no presumption of correctness afforded to the conclusions of the court below." State v. McKnight, 51 S.W.3d 559, 562 (Tenn. 2001) (citing Comdata Network, Inc. v. Tennessee Dept. of Revenue, 852 S.W.2d 223, 224 (Tenn.1993); Tennessee Farmers Mut. Ins. Co. v. Witt, 857 S.W.2d 26, 29 (Tenn.1993); Nash v. Mulle, 846 S.W.2d 803, 804 (Tenn.1993)).

## Analysis

### The Definition of an Investment Contract

We begin our analysis with the language of the Tennessee Securities Act of 1980, which defines the term "security" as follows:
    (12) 'Security' means any note, stock, treasury stock, bond, debenture, evidence of
    indebtedness, certificate of interest or participation in any profit-sharing agreement,
    collateral-trust certificate, preorganization certificate or subscription, transferable

-4-

share, *investment contract*, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

Tenn. Code Ann. § 48-2-102(12) (1995) (emphasis added). This definition is substantially identical to definitions contained in the federal Securities Act of 1933 and the federal Securities Exchange Act of 1934 . See Securities Act of 1933, 15 U.S.C. § 77b(1) (2002); Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (2002). While the statute makes plain that an investment contract is a security, the statute does not define the term "investment contract."

The Commissioner argues that the Court of Appeals' decision rejecting Brewer and applying Howey-Forman conflicts with the fundamental purpose of Tennessee's securities laws, which is to protect investors. As support for this claim, the Commissioner relies upon this Court's decision in DeWees v. State, 390 S.W.2d 241, 242 (Tenn. 1965), directing that securities laws are remedial statutes that must be liberally construed to protect investors from fraud.

A brief review of the development, history, and purpose of state securities laws is necessary to place this issue in context. Securities regulation first developed as state law. State securities statutes, or "blue sky" laws, were this country's sole means of regulating securities for more than two decades, until the federal government enacted the Securities Act of 1933 and the Securities Exchange Act of 1934.[1] In creating the federal securities regulation laws, Congress has specifically refused to preempt state blue sky laws. See 15 U.S.C. § 77r (2002). Thus, both state and federal laws now regulate the marketing and sales of securities.

One reason for this dual system of securities regulation is that the state and federal laws were adopted to serve different purposes. Like Tennessee, states enacted securities regulation to protect investors. See 1980 Tenn. Pub. Acts, ch. 866, § 25 (stating that the securities laws are intended "to protect investors"); see also, e.g., Carder v. Burrow, 940 S.W.2d 429 (Ark. 1997); People v. Figueroa, 715 P.2d 680, 695 (Cal. 1986); Rosenthal v. Dean Witter Reynolds, 908 P.2d 1095, 1105 (Colo. 1995); Skurnick v. Ainsworth, 591 So.2d 904, 906 (Fla. 1994); Ratliffe v. Hartsfield Co., 184 S.E. 324, 327 (Ga. 1935); State v. Hawaii Market, 485 P.2d 105, 109 (Haw. 1971); State v. Coin Wholesalers, Inc., 250 N.W.2d 583, 588 (Minn. 1976). Federal securities regulations, on the other hand, were enacted to serve the broader purpose of protecting the integrity of the increasingly nationalized market. See 15 U.S.C. § 78b (2002); Robert B. Thompson, The Measure of Recovery Under Rule 10b-5: A Restitution Alternative to Tort Damages, 37 Vand. L. Rev. 349, 393 (1984)

---

[1]See generally Jonathan R. Macey & Geoffrey P. Miller, Origin of the Blue Sky Laws, 70 Tex. L. Rev. 347 (1991).

(quoting Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 236-37 (2d Cir. 1974)).

The different, but complementary, purposes served by the dual system of securities regulation is further reflected in the differing treatment of the term "investment contract" by state and federal courts. The term was first used by state legislatures and first construed by state courts. Seeking to afford maximum protection to investors, state courts, like the Minnesota Supreme Court,[2] construed the term broadly in accordance with its commonly understood meaning.

Twenty-six years later, the United States Supreme Court defined "investment contract" as it applied to the Securities Exchange Act of 1933 in SEC v. W.J. Howey Co., 328 U.S. 293 (1946). Under Howey, an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Id. at 298-99 (emphasis added). This definition was criticized as being too rigid, particularly its requirement that profits be derived solely from the efforts of the promoter or a third party.[3]

In 1971, the Hawaii Supreme Court became one of the first state courts to openly reject the Howey test and formulate a more flexible test for determining which transactions constitute an investment contract under its state securities laws.[4] See State v. Hawaii Market, 485 P.2d 105 (Haw.

_____

[2]The Minnesota Supreme Court stated: "The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an investment as that word is commonly used and understood. If defendant issued and sold its certificates to purchasers who paid their money, justly expecting to receive an income or profit from the investment, it would seem that the statute should apply." State v. Gopher Tire & Rubber Co., 177 N.W. 937, 938 (Minn. 1920).

[3] See, e.g., SEC v. Koscot Inter., Inc., 497 F.2d 473, 479-84 (5th Cir. 1974); SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476, 482 (9th Cir. 1973); State v. Hawaii Market, 485 P.2d 105, 108 (Haw. 1971) ("The primary weakness of the Howey formula is that it has led courts to analyze investment projects mechanically, based on a narrow concept of investor participation." (citations omitted)).

[4]Note, however, that the Minnesota Supreme Court, which construed "investment contract" in 1920, continues to adhere to its initial construction and refuses to follow Howey. "In contrast to the fairly rigid Howey test, we have continued to abide by a broader and more flexible standard. In State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938 (1920), we defined an investment contract as '[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment.' As recently as 1973, this court exhaustively reviewed the history of securities regulation in this state and concluded that although 'the Howey test is useful in

(continued...)

1971).  The <u>Hawaii Market</u> test requires proof of the following four elements for an investment contract to be present:

> (1) An offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

<u>Id.</u> at 109.  The Hawaii Supreme Court utilized the concepts from "risk capital theory," stating that the "subjection of the investor's money to the risks of an enterprise over which he exerts no managerial control is the basic economic reality of a security transaction." <u>Id.</u>

A few years after the <u>Hawaii Market</u> decision, the United States Supreme Court revisited the test adopted in <u>Howey</u>.  Responding to the criticism of <u>Howey</u>, the Court in <u>Forman</u> emphasized that in determining whether a particular transaction is an investment contract and thus a "security," the focus must be on "the substance — the economic realities of the transaction — rather than the names that may have been employed by the parties." <u>United Hous. Found., Inc. v. Forman</u>, 421 U.S. 837, 851-52 (1975).  To this end, the Court stated that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." <u>Id.</u> at 852.  Thus, the "<u>Howey</u>-<u>Forman</u>" test emerged as the new, more flexible federal test for what constitutes a security.

Against this backdrop, in 1996, the Tennessee Court of Criminal Appeals elected to employ the <u>Hawaii Market</u> test to determine whether the transaction in question was an investment contract under Tennessee law. <u>See</u> <u>Brewer</u>, 932 S.W.2d  at 14.  In support of its decision, the <u>Brewer</u> court noted that, as of 1996, seventeen jurisdictions had adopted the <u>Hawaii Market</u> test.  <u>See</u> <u>id.</u> at 13 n.13.  Furthermore, <u>Brewer</u> highlighted the similarities between the two tests as follows:

> The first prong of the <u>Hawaii Market</u> test is nothing more than the investment concept of the <u>Howey</u>-<u>Forman</u> test.  The second prong adopts the concept of risk capital, whereas <u>Howey</u>-<u>Forman</u> focuses on the existence of a common venture, i.e., vertical or horizontal commonality.  The third prong of <u>Hawaii Market</u> utilizes the more liberal concept of the expectation to receive a "benefit" instead of the slightly

---

[4](...continued)
identifying most "investment contracts," we decline to adopt it as exclusive under our statute.' <u>State v. Investors Security Corp.</u>, 297 Minn. 1, 11, 209 N.W.2d 405, 410 (1973). We remain convinced that the Gopher Tire test is better suited to facilitate the objectives of our securities act, which is designed to protect investors by regulating the merits of securities offered for sale to the public." <u>State by Spannaus v. Coin Wholesalers, Inc.</u>, 250 N.W.2d 583, 588 (Minn. 1976).

more restrictive concept of "profits" found in <u>Howey</u>-<u>Forman</u>. Lastly, the fourth prong makes explicit, in layman's terms, the <u>Howey</u>-<u>Forman</u> principle that the investor exercises no managerial control.

<u>Id.</u> at 13-14.

In adopting the <u>Hawaii Market</u> test, the <u>Brewer</u> court noted that <u>DeWees</u> mandated liberal construction of securities laws to protect the public and that the <u>Hawaii Market</u> test better serves the remedial purpose of Tennessee's securities laws by embracing not only "obvious and commonplace" investment schemes, but also "'the countless and variable schemes devised by those who seek the money of others on the promise of profits.'" <u>Id.</u> at 14 (quoting <u>Howey</u>, 328 U.S. at 299). Additionally, the <u>Brewer</u> court deemed the <u>Hawaii Market</u> test superior in providing detailed statements of its elements in layman's terms, which promotes the proper administration of justice by the jury. <u>Id.</u>

In this case, the test adopted in <u>Brewer</u> was applied by the administrative law judge, the Commissioner, and the chancery court. However, the Court of Appeals adopted the <u>Howey</u>-<u>Forman</u> test used by the Sixth Circuit in <u>Cooper v. King</u>, No. 96-5361, 1997 U.S. App. LEXIS 11296, (6th Cir. May 9, 1997), an unpublished case involving the sale of pay telephones in the same manner and under the same terms as in the present case.[5]

After careful consideration, we conclude the Court of Appeals erred in adopting the <u>Howey</u>-<u>Forman</u> test. The appropriate test for defining an "investment contract" under Tennessee law is the <u>Hawaii Market</u> test adopted in <u>Brewer</u>. First, the General Assembly has stated that the Tennessee Securities Act of 1980 should be interpreted "to effectuate its general purpose to protect investors" and "to coordinate the interpretation and administration of this Act with related federal and state regulation." 1980 Tenn. Pub. Acts, ch. 866, § 25. As noted by the <u>Brewer</u> court, the <u>Hawaii Market</u> test better serves the remedial purpose of Tennessee's securities laws by embracing not only "obvious and commonplace" investment schemes, but also "'the countless and variable schemes devised by those who seek the money of others on the promise of profits.'" <u>Brewer</u>, 932 S.W.2d at 14 (quoting <u>Howey</u>, 328 U.S. at 299). As previously explained, state and federal regulations serve different purposes. While the federal test is tailored to federal law, the <u>Hawaii Market</u> test adopted in <u>Brewer</u> is more in keeping with the public policy espoused by this Court in <u>DeWees</u> because it presents a more flexible definition of "investment contract."

---

[5]In <u>Cooper</u>, the plaintiffs were individuals who participated in the QCI payphone sale-leaseback program. QCI defaulted on its payments to the plaintiffs after only four payments, and the performance bond payed only a fraction of its obligation. The plaintiffs sued in federal court under federal and state securities laws, but the District Court and the Court of Appeals found that the program was not a security under the <u>Howey</u>-<u>Forman</u> test, as the courts found that the second prong of the <u>Howey</u>-<u>Forman</u> test, "a common enterprise," was lacking.

King argues that the Howey-Forman test advances the second stated purpose of the 1980 Act — uniformity and coordination with state and federal regulation. See 1980 Tenn. Pub. Acts, ch. 866, § 25. In support of this argument, King emphasizes that the Howey-Forman test has been adopted by a majority of jurisdictions and that the ample case law from other jurisdictions applying the Howey-Forman test to various transactions provides notice to investors and brokers of the types of transactions that qualify as investment contracts under Tennessee law. We disagree. While the General Assembly clearly intended for Tennessee's securities laws to operate harmoniously with federal and other state securities regulations, adopting the Howey-Forman test does not accomplish this result because this test is not consistently applied among the states or the federal circuits.

The primary area of disagreement surrounds the Howey-Forman test's second element: a common enterprise. Three bases for commonality are recognized by the federal courts. The strictest test is that of horizontal commonality, requiring the pooling of assets in which the fortunes of the individual investors are inextricably intertwined by contractual and financial arrangement. See Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174, 1183 (6th Cir. 1981). The other test, vertical commonality, has two variants. Narrow vertical commonality requires that the investors' fortunes be "interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." SEC v. Glenn W. Turner Enters., 474 F.2d 476, 482 n.7 (9th Cir. 1973). Broad vertical commonality, on the other hand, only requires that the well-being of the investors be dependent on the promoter's experience. See SEC v. SG Ltd., 265 F.3d 42, 49 (1st Cir. 2001).

The United States Supreme Court has not adopted a test for the common enterprise element of the Howey-Forman test, and the circuits are split on this issue. Both the Sixth and Seventh Circuits require a showing of horizontal commonality to satisfy the common enterprise element. See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, 622 F.2d 216, 222, 224 (6th Cir. 1980); Wals v. Fox Hills Dev. Corp., 24 F.3d 1016, 1018 (7th Cir. 1994). Four other circuits have adopted horizontal commonality, but have yet to rule on whether vertical commonality also would be acceptable. See SEC v. Infinity Group Co., 212 F.3d 180, 187 n.9 (3d Cir. 2000), cert. denied, 121 S. Ct. 1228 (2001); SEC v. Life Partners, Inc., 87 F.3d 536, 544 (D.C. Cir. 1996); Teague v. Bakker, 35 F.3d 978, 986 n.8 (4th Cir. 1994); Revak v. SEC Realty Co., 18 F.3d 81, 88 (2d Cir. 1994)(rejecting broad vertical commonality). Thus, the Howey-Forman test is not applied consistently among the circuits. Moreover, despite its adherence to horizontal commonality, the Sixth Circuit has not been consistent in its interpretation of the "pooling of funds" requirement.[6] In

---

[6] For example, in McCoy v. Hilliard, 940 F.2d 660, 1991 U.S. App. LEXIS 17760 at 24 (6th Cir. 1991), the Sixth Circuit found that an investment contract existed where river barges were sold either individually or through limited partnerships to investors and the barges themselves, rather than investor funds, were pooled. In SEC v. Professional Associates, 731 F.2d 349, 354 (6th Cir. 1984), the Sixth Circuit found that certain trust agreements were investment contracts, because although

(continued...)

addition, states within the Sixth Circuit — Ohio, Kentucky, and Michigan — have varying approaches to defining an investment contract. The Ohio Court of Appeals has adopted the Hawaii Market test. See State v. George, 362 N.E.2d 1223 (Ohio. App. 1975). The Kentucky Court of Appeals has adopted the Howey-Forman definition, as has the Michigan Court of Appeals. See Scholarship Counselors, Inc. v. Waddle, 507 S.W.2d 138 (Ky. 1974); Rzepka v. Michael, 431 N.W.2d 441 (Mich. App. 1988). However, a Michigan statute defines "security" by using the language of the Hawaii Market test. See Mich. Comp. Laws § 451.801(1) (2002). Given the federal and state courts' varying interpretations of Howey-Forman, King's assertion that its adoption will advance uniformity and predictability has a hollow ring.

We reiterate and reaffirm our statement in DeWees, that securities laws "are remedial in character, designed to prevent frauds and impositions upon the public, and consequently should be liberally construed to effectuate the purpose of the acts." 390 S.W.2d at 242. Since the Tennessee Securities Act of 1980 was enacted with the goal of protecting investors, this Court's primary concern is with the investors of this state. This Court also believes that the danger in adopting the stricter Howey-Forman test for "investment contract" is that it allows unscrupulous promoters to circumvent the law. Thus, we find that the Hawaii Market test as adopted in Brewer is the test better suited to protect investors.

## The *Brewer* Test as Applied to the Sale-Leaseback Program

### A. Initial Value

The first prong of the Brewer test requires that the offeree furnishes "initial value." Participants in King and QCI's program bought a minimum of three pay telephones at $4995 per pay telephone. Participants never took possession of the phones, nor did participants pay taxes on the phones or choose locations for their phones. Furthermore, it is clear from promotional materials that QCI intended the program to "quickly raise money for capital expenditures and expansion, without sacrificing equity in the company."

---

[6](...continued)
there was no commingling of investor assets, the court looked to promotional materials that "gave rise to an implication that investors' funds were to be pooled" and considered testimony that suggested that some investors' money was actually commingled. Finally, in Cooper v. King, 1997 U.S. App. LEXIS 11296, at *6, the Sixth Circuit found that while pooling of funds was present, there was no evidence of contractual or financial arrangement that "inextricably intertwined" the investors' fortunes, thus, contrary to the holding in Professional Associates, horizontal commonality was not present in Cooper.

King argues that, in the case of the sale of personal property, there must be an overpayment of fair value by the investor in order for there to be a finding of initial value. King bases his argument on Hawaii Market, in which participants in a private wholesale club scheme payed grossly inflated prices for consumer items in order to join the club and receive future commissions on sales. Rather than being a requirement for "initial value," however, the presence of overpayment was simply how the Hawaii Market court distinguished the transaction from a simple purchase of merchandise. In this case, King's program requires little distinguishing from a sale of merchandise: purchasers never took possession of the pay telephones, and, furthermore, QCI was not in the business of selling pay telephones: QCI was in the business of providing discount long-distance telephone service. Thus, this Court finds that Prong 1, the furnishing of initial value, is satisfied.

### B. Initial Value Subject to the Risks of the Enterprise

The second prong of the Brewer test requires that a portion of the initial value be subject to the risks of the enterprise. As the Brewer court stated, this "second prong adopts the concept of risk capital." Brewer, 932 S.W.2d at 13. The Brewer court explained that "[u]nder the risk capital test the focus is . . . on whether the promoter is relying on the investors for a substantial portion of the initial capital necessary to launch the enterprise." Id. at 11 (citing State v. Consumer Bus. Sys., Inc, 482 P.2d 549, 555 (Or. App. 1971)). QCI was looking for a quick means of financing a $50 million expansion. The promotional materials clearly stated that "[b]y going to private investors, QCI is able to raise expansion capital quickly without having to give up valuable equity." These promotional materials clearly reflect the risk capital concept: investors were sought out by King, they paid value, and in return they expected QCI to pay them a return on their investment. Furthermore, investors did not rely on their own pay telephones to produce an income; instead, investors were dependent on the profitability of the entire enterprise.

King argues that this prong is not met because the lease provided for a fixed payment that was secured by a performance bond. However, it is clear from the record that potential investors were led to believe that the transaction was an investment. QCI promotional materials invited participants to join "our growing QCI network" and pledged that "it is QCI's business policy to share the profits with our clients, by paying them a very high rate of return." The chancery court found that the performance bond was essentially worthless from the outset because it was guaranteed by an insurance company that was neither registered nor qualified to do business in Tennessee. King asks this Court to look only at the structure of the transaction, to focus on the provision of the lease securing payment by a performance bond, and to ignore the reality that the performance bond was worthless. To do so would exalt form over substance, something which, in the interest of protecting the investors of this state, this Court refuses to do. Thus, we find that the second prong of the Brewer test is met.

### C. Initial Value Induced by Promises of Benefits in Excess of Initial Value

The third prong of the <u>Brewer</u> test is that the investor had a "reasonable understanding that a valuable benefit of some kind, over and above initial value, will accrue as a result of the operation of the enterprise." <u>Brewer</u>, 932 S.W.2d at 11. The QCI promotional materials are relevant to determining the existence of this element. The materials contain several assurances that participants will receive a benefit:

> I assume you are interested [in this program] because you are fed up with 3% or 4% returns on your savings; or, maybe you are uncomfortable with risking your money in the stock market?

Admin. R. at 64.

> QCI's Telephone Equipment Lease Agreement will give you an exceptional *18%* return on your principal. This is what you will earn each year for a five year term. You will receive a check for *$75.00* for *60* consecutive months for each unit purchased.

Admin. R. at 68 (emphasis in original).

King argues that the third prong of the <u>Brewer</u> test is lacking because QCI's obligation was fixed and was not dependent on the enterprise making a profit. However, the <u>Hawaii Market</u> court rightly noted that it is "irrelevant to the protective policies of the securities laws that the inducements leading an investor to risk his initial investment are founded on the promises of fixed returns rather than a share of profits." <u>Hawaii Market</u>, 485 P.2d at 110. Participants in this sale-leaseback program clearly expected a benefit as the result of QCI's successful operation, and the third prong is thus satisfied.

## D. No Right to Exercise Control

The fourth and final prong of the <u>Brewer</u> test requires that the "offeree does not receive the right to exercise practical and actual control over managerial decisions of the enterprise." <u>Brewer</u>, 932 S.W.2d at 11. King argues that since the purchaser has the right to terminate the relationship with QCI, the purchaser has the right to exercise ultimate control over the destiny of his or her phone. The State calls this right to terminate misleading: the agreement actually requires the payment of a potentially large early termination fee, and QCI limits the number of early terminations it must accept in any sixty-day period. Additionally, as the Commissioner points out, the right to terminate relates to liquidity. The right to terminate certainly is not the equivalent of exercising practical and actual control over managerial decisions. Participants in this sale-leaseback program had no right to exercise practical or actual managerial control. Participants never took possession of the pay telephones, and they had no control over the location or use of the telephones. Thus, we find that the participants did not receive the right to exercise practical and actual control over managerial decisions and that the fourth and final prong of the <u>Brewer</u> test is satisfied.

-12-

## Conclusion

For the reasons stated herein, we hold that the QCI sale-leaseback program marketed and sold by the plaintiff was a security under the Tennessee Securities Act of 1980. Therefore, the plaintiff was offering and selling an unregistered security in violation of Tennessee law. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the Tennessee Department of Commerce and Insurance. Costs of this appeal are taxed to the appellee, John T. King, for which execution may issue if necessary.

_____

FRANK F. DROWOTA, III, CHIEF JUSTICE