IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2004 Session

## NANCY CAROL CANTRELL v. JAMES MARK CANTRELL

**Appeal from the Chancery Court for Williamson County**
**Nos. 28051 and 28245      R. E. Lee Davies, Judge**

_____

**No. M2003-00551-COA-R3-CV - Filed March 28, 2005**

_____

This is a divorce proceeding in which the parties accused each other of inappropriate marital conduct. The trial court granted both parties a divorce, and custody of the parties' child was awarded to Husband along with child support. Marital property, mostly debts, was allocated in part to Husband and in part to Wife. The trial court declined to assess attorney fees. Wife appealed claiming that she should have been granted the divorce and custody of the child. Wife also claimed that the marital debts were not allocated equitably and that she should have been awarded her attorney fees. We modify in part and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Modified in Part, Affirmed and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, and Virginia Lee Story, Franklin, Tennessee, for the appellant, Nancy Carol Cantrell.

J. Timothy Street and William Donnell Young, Jr., Franklin, Tennessee, for the appellee, James Mark Cantrell.

### OPINION

James Mark Cantrell (Husband) and Nancy Carol Cantrell (Wife) married in July of 1990. They have one minor child. In July of 2001, Husband filed a complaint for divorce on the grounds of irreconcilable differences and inappropriate marital conduct. Wife filed a separate complaint for legal separation, which was assigned a separate docket number and thereafter consolidated with Husband's divorce action. Wife amended her complaint, seeking a divorce on the grounds of adultery and inappropriate marital conduct.

Husband claimed Wife was guilty of inappropriate marital conduct based on her alleged mismanagement of finances. He specifically complained about "her" former business, Blue Moon School of Music, aka Bleu Moon, which listed debts of $29,800 at the end of the marriage.[1] Wife claimed her finances had little to do with their marital problems. She claimed Husband desired a divorce for one reason, to pursue his extramarital relationship with another woman.

This has been a very contentious divorce. The record is replete with restraining orders enjoining the parties from dissipating marital property, from harassing or threatening one another, and from removing the child from the state. Specifically, Wife was restrained from writing checks on Husband's business account and from cursing Husband at visitation exchanges, and Husband was restrained from interfering with Wife's custody of the child.

The divorce was tried over a period of five months, on August 9, December 12 and December 13, 2002. Finding both parties culpable, the trial court awarded both parties a divorce pursuant to Tenn. Code Ann. §36-4-129 based on each party's inappropriate conduct. The parties' assets, mostly debts, were divided primarily on what the parties identified as "his" business and "her" business. Husband was awarded his business, Arrowhead Survey, and its debts of approximately $9,000. Wife was awarded her business, Blue Moon, which closed prior to the divorce. Blue Moon had no assets and its debts, the amount of which was disputed, were between $9,000 and $29,800. Wife was additionally held solely responsible for a Bank of America debt of approximately $22,000. Husband was awarded primary physical custody of their child, and Wife was ordered to pay child support. The trial court declined to assess attorney fees, thus each party was responsible for his or her own attorney fees. Court costs were assessed equally.

Wife filed a motion to alter or amend, or alternatively, a motion for a new trial. The trial court denied her motion. Wife appealed.

## Issues

We are presented with four issues.[2] One, Wife asserts that the trial court erred in granting the divorce to both parties, arguing that she was entitled to a divorce because the "overwhelming circumstantial evidence" established that Husband was having an extramarital affair. Two, Wife contends that the trial court erred in designating Husband as the primary residential parent. Three, she contends the marital debts were not equitably allocated. Four, she challenges the trial court's denial of her request to recover her attorney fees. Husband does not appeal the trial court's decisions, nevertheless, he and Wife seek to recover attorney fees incurred on appeal.

---

[1] The record indicates that the Blue Moon debt is actually $29,800. In its memorandum opinion the trial court, for whatever reason, rounded Blue Moon's debt down to $29,000. The trial court stated that it appeared that approximately $20,000 of Blue Moon's debt had been written off by Blue Moon's creditors, as there had been no attempts to collect the debt in over a year. It then held that Wife would be responsible for all Blue Moon debts in the approximate amount of $9,000.

[2] Wife's brief sets forth six issues for appeal. We have consolidated her issues to four.

## Standard of Review

The trial court's findings of fact are reviewed *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). "Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1999) (citing *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563, 567 (Tenn. Ct. App. 1991)). Questions of law are not entitled to Tenn. R. App. P. 13(d)'s presumption of correctness on appeal. We will review the legal issues *de novo* and reach our own independent conclusions regarding them. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001); *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002).

## Granting Both Parties the Divorce

Wife asserts that the trial court erred by declaring the parties divorced instead of granting the divorce to her. She contends that she alone should be granted the divorce due to Husband's alleged extramarital affair with April Weller while Husband contends that Wife's financial affairs caused the divorce. The trial court stated that it was not willing to grant a divorce to Husband based on his dissatisfaction with Wife's financial decisions or to Wife based on Husband's alleged infidelity. Instead, it found both parties guilty of inappropriate marital conduct and declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b). The statute provided in pertinent part:

> The court may, upon stipulation to or proof of any ground for divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault *or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.* (emphasis added)

The trial court's assessment of the parties' marital conduct and the reasons for the dissolution of the marriage is set forth in its memorandum opinion. In pertinent part the trial court found:

> Ms. Cantrell contends that her husband is guilty of adultery or at the very least inappropriate marital conduct on the part of her husband with another woman, April Weller. Other than her own testimony concerning admissions made to her by April Weller and her husband, Ms. Cantrell produced no credible evidence of improper conduct on the part of her husband with Ms. Weller. The Court finds Ms. Cantrell not credible with regard to this issue. On the other hand, Ms. Weller was credible.
>
> Mr. Cantrell's major complaint concerning his wife seems to be that she mismanaged the finances and refused to consult with him before making these decisions especially when it related to her music business, "Blue Moon" which turned out to be a substantial drain on the parties finances. While this may be true,

this Court is not prepared to award a divorce to one party simply because the other party is dissatisfied with the financial decisions of the other.

In reviewing all of the evidence, the primary reason for the break up of this marriage appears to be a combination of two factors. Mr. Cantrell, for whatever reason, decided he no longer wanted to be married and abruptly moved out of the home, much to the surprise of Ms. Cantrell. For her part, Ms. Cantrell, rather than accepting any blame herself, perceived that April Weller was the reason for the breakup of her marriage. She then made false accusations regarding this alleged affair throughout the community. In fact, Ms. Cantrell harassed Ms. Weller on her own property to the point that Ms. Weller had to call the police.

Husband denied having an adulterous affair but admitted that he occasionally dined with April Weller, washed his clothes at Ms. Weller's home, helped Ms. Weller locate a rental home, hired her as his bookkeeper and rented a car for her to drive. Husband's explanation of his relationship with Ms. Weller would be characterized as that of friendship. Husband's explanation, however, was undermined by the testimony of Pastor William Sasser, whose church was across the street from Ms. Weller's residence.[3] Pastor Sasser, who was Ms. Weller's landlord, admitted that he kept an eye on things at Ms. Weller's residence due to rumors within his congregation. He admitted that he suspected Husband was having an affair with Ms. Weller. As Pastor Sasser explained:

Q       [Y]ou saw his [Husband's] truck over there [April Weller's home] one day and you saw his truck the next morning about 6:30, I'm trying to find out did you see Mr. Cantrell on the day you saw his truck over there before the next morning?

A       He went to his truck that morning to get something and walked back in the house.

Q       All right, that morning?

A       Yes, sir.
. . . .

Q       Okay, and do you know whether Ms. Weller was even in the house or not at that point in time?

A       I believe she was because she left later.

Q       How do you know that?

A.      Because I stayed over at the church building.

Q       Oh, you stayed over at the church building and saw her leave later?

A       Yes, sir.
. . . .

Q       You just made a decision in your own mind that there was some hanky panky going on . . . .

_____

[3]The residence Ms. Weller rented was owned by Pastor Sasser's church.

A        No, sir.  What I did was this, we graciously allowed this lady to have a place to stay. . . .  When Mr. Cantrell asked me, I didn't see any pre-conceived motives.  They only came up as we saw him over there a lot.  The little lady that lives on our premises also mentioned this to me and so instead of being a secondhand witness I went over there myself – one early – I was over there one night on business of the church.  I was not over there trying to spy on anybody.  And he was over there and then I went out there the next morning and his truck was still there.  As far as I could tell it hadn't moved.

The trial court characterized Wife's accusations of an extramarital affair between Husband and April Weller as "not credible."  A trial court's determination of witness credibility is given great weight on appeal, because only the trial court has the opportunity to observe the parties, assess their demeanor and gauge their veracity. *Bowman*, 836 S.W.2d at 567; *Massengale*, 915 S.W.2d at 819. Giving great weight to the trial court's characterization of Wife's accusations concerning Husband's relationship with Ms. Weller, we are unable to conclude that their relationship constituted an adulterous affair.  Nevertheless, the testimony of Pastor Sasser combined with Husband's admissions are more than sufficient to establish that Husband engaged in inappropriate marital conduct.[4]  As for Wife's conduct, the court found her to be partly at fault.  Rather than accepting any of the blame, the court found that she assumed Husband was having an affair with April Weller, rumors of which she spread throughout the community.  Though Wife presented circumstantial evidence of an affair, the trial court was persuaded by the testimony of Husband and April Weller, both of whom denied an improper relationship.[5]

The record supports the trial court's finding that both spouses engaged in conduct that caused distress to the other party and contributed to the dissolution of the marriage.[6]  Nevertheless, Wife complains that the trial court should have compared the degree of fault and found Husband more at fault.  Wife's contention, however, is without merit because the trial court is not required to weigh the parties' relative degrees of fault or grant the divorce to the party who, in the eyes of the court,

---

[4]The court identified Husband's inappropriate marital conduct as being that he no longer wanted to be married and his abrupt departure from the marital home

[5]Wife filed a motion asking that we consider Husband's marriage to April Weller on May 10, 2003, five months following the divorce proceedings on appeal, as post judgment facts.  Wife asserts this is relevant because Husband and Ms. Weller denied any improper relationship. The trial court found Wife's accusations "not credible." The characterization was based in part on the denials. The speed by which Husband and Ms. Weller married following the divorce may raise questions about their veracity, and it may be relevant in future proceedings, if any, in the trial court; however, the marriage is not relevant to this appeal because our review is limited to the record and the evidence presented at trial. Accordingly, the motion to consider the marriage was respectfully denied.

[6]While some of Husband's inappropriate conduct was witnessed after the parties' separation, particularly that witnessed by Pastor Sasser, his post-separation conduct may be considered when deciding which party should be awarded the divorce. *Jarvis v. Jarvis*, No. M1998-00905-COA-R3-CV, 2002 WL 1679428, at *2 (Tenn. Ct. App. Nov. 9, 2000). S*ee also Clark v. Clark*, 644 S.W.2d 681, 682 (Tenn. Ct. App. 1982) and *Schwalb v. Schwalb*, 282 S.W.2d 661, 671 (Tenn. Ct. App. 1955) (upholding divorces on the grounds of adultery when the adultery occurred after the parties separated.)

is less at fault. *Hill v. Hill*, No. M2001-01016-COA-R3-CV, 2002 WL 31863295, at *3 (Tenn. Ct. App. Dec. 23, 2002) (citing *Wilson v. Wilson*, 987 S.W.2d 555, 558 (Tenn. Ct. App. 1998)). Moreover, it need not make written findings regarding relative degrees of fault. *Varley v. Varley*, 934 S.W.2d 659, 665 (Tenn. Ct. App. 1996). In fact, "[A] divorce suit is not designed to determine which spouse has been perfect in behavior, for perfection is found no more in marriage than elsewhere. Seldom is a marriage dissolved in a contested case, without some evidence of some imperfection in both spouses." *Bush v. Bush*, 684 S.W.2d 89, 92 (Tenn. Ct. App. 1984). This marriage was no exception. Therefore, we affirm the decision of the trial court to declare the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b) without awarding the divorce to one spouse or the other.

### Custody

Wife contends that the trial court erred by designating Husband as the primary residential parent. No decisions in divorce cases require a more delicate touch than those involving child custody and visitation. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997) Courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Id.* at 484; *see also Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996). Moreover, these decisions are not intended to reward or to punish parents. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App.1991). Indeed, the interests of the parents are secondary to those of the children. *See Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992). As this court has stated:

> Custody decisions are factually driven and require the careful consideration of numerous factors. *See Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950); *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn. Ct. App. 1988). Since these decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988). Accordingly, we decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them. *See Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Gaskill v.* Gaskill, 936 S.W.2d 626, 631 (Tenn. Ct. App.1996); *Griffin v. Stone*, 834 S.W.2d at 301.

*Adelsperger,* 970 S.W.2d at 485; *see also D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct . App. 1995) (holding that a trial court's decision regarding custody or visitation will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record").

The trial court stated that it attempted a shared custody arrangement only to later determine that joint custody was not feasible. After conducting hearings, one in August and two in December

of 2002, the court designated Husband as the primary residential parent. Its reasoning is expressed in the memorandum opinion:

> Although in theory, shared custody may seem to be the best approach, the Court finds that unless the parties are able to work together for the benefit of their child, equal joint custody is not practical. In this case, it was the Court's intention to attempt a shared custody arrangement; however, Ms. Cantrell by her testimony and conduct since the August 2002 order has made it clear that shared custody will not work in this case. Therefore, the Court turns to the factors set forth in T.C.A. § 36-6-106.
>
> . . . .
>
> Perhaps the most significant factor in this case is the willingness and ability of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. Mr. Cantrell did not hesitate to admit that Ms. Cantrell was a good mother, that she was involved with her son, and that during his infancy she was Chase's primary care giver. On the other hand, Ms. Cantrell spent most of her time criticizing Mr. Cantrell . . . . The Court is convinced if primary custody is awarded to Ms. Cantrell, she will make a concerted effort to destroy the parent-child relationship between Chase and his father. In fact her attempt to relocate to Mississippi with Chase during the pendency of this case is further evidence of her desire to separate Chase from his father. Without a doubt, Ms. Cantrell harbors ill feelings against her husband for leaving her and unfortunately, she allows these feelings to interfere with her parenting decisions regarding Chase. Although she claims she does not make derogatory remarks about his father to Chase, the Court finds otherwise.
>
> . . . .
>
> The Court is also impressed with the character of Mr. Cantrell's mother, with whom he and Chase live. . . .
>
> For all of the above reasons, the Court finds that it is in the best interest of Chase to award primary physical custody to Mr. Cantrell.

Tenn. Code Ann. § 36-6-106 sets forth factors to be considered when the court is to make a custody determination regarding a minor child. The statute instructs the courts to consider all relevant factors, the most important of which is the best interest of the child. Factors listed in Tenn. Code Ann. § 36-6-106 that are most relevant to this proceeding include:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;
. . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Utilizing the foregoing factors as its guide, the trial court made several findings of fact. We review findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). The trial court found the willingness and ability of the parents to facilitate and encourage a close and continuing parent-child relationship to be the most significant factor in this case.

The court noted that Husband admitted that Wife was a good mother, but found that Wife occasionally criticized Husband. The trial court relied heavily on one phone message that she left on Husband's answering machine that was laced with profanity. The trial court made a finding that Wife harbored and expressed ill will toward Husband. Though the record contains evidence to justify her harboring ill feelings, a parent must comport themselves around the children in a manner devoid of expressing criticism of the other parent. Wife disputed expressing such ill will around the children on but a few occasions; nevertheless, the record supports such a finding.

The trial court also found Husband's mother, with whom he lived, to be of good character, a benefit to the parties' child and thus a factor in Husband's favor.[7] This finding is fully supported by the record.

Though the trial court's memorandum makes no reference to the other witnesses, the record reveals that a number of witnesses testified that Mother was the primary caregiver, including Michelle Mathis, Jennifer Moore, and Cindy Ayala, and that she was a positive influence in the child's life. One of the child's teachers, Mary Schuff, was asked if Wife was a concerned parent:

---

[7]Though Wife's motion to consider post judgment facts suggests that Husband has remarried, thus mother may no longer reside with him and the child, we are not permitted to consider the post judgment facts nor may we conjecture as to her present residence. That would be a matter for the trial court in the event a petition to change custody is filed.

A      I would say so, yes.
Q      Have you seen anything about her behavior that is adverse to Chase?
A      No, ma'am.
Q      Does she appear to have a good close bonding with Chase?
A      Yes, they seem to have a good relationship.
. . . .
Q      Have you ever seen her state or do anything in front of Chase that's negative toward Mr. Cantrell?
A      No.

The trial court made a finding that Wife was attempting to prevent Husband from seeing the child by seeking to relocate to Mississippi and that such efforts were evidence of her desire to sabotage the father-son relationship. We, however, find the evidence preponderates against such a finding. Wife sought the court's permission to relocate to Mississippi in order to obtain better employment. By seeking the court's permission to relocate, Wife followed the proper procedure. Moreover, though the court denied Wife's relocation request, she acceded to the court's decision and has remained in Williamson County. Moreover, Wife provided a reasonable explanation for the proposed relocation. She explained that she had not been able to find a good music teaching job locally and those she found did not provide health insurance.

The record also contains evidence adverse to Husband, particularly that Husband was verbally abusive of Wife and called her derogatory names (a "fat a-s-s bitch") and that Husband on one occasion threw a can of pencils against the wall and knocked papers off the desk during an argument with Wife, following which Wife called "911."

In recognition of the trial court's broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case, we find no error with and, therefore, affirm the trial court's designation of Husband as the primary residential parent.

### Division of Marital Debt

Wife asserts that the trial court's allocation of martial debts was inequitable, contending that the trial court ultimately allocated $61,452, or 71% of the marital debt to her and only $25,085, or 29% of the marital debt to Husband.[8] She takes particular issue with a $22,000 loan from the Bank of America. Husband claims the trial court properly allocated the $22,000 debt owing to Bank of America to Wife because the loan was applied to "her" business, Blue Moon. The trial court's findings relative to the marital assets and debts are as follows:

Husband does have a surveying business known as Arrowhead Survey, Inc., a Sub S corporation. This corporation has no value over and above its debt. With

---

[8] As the trial court noted, this was one of the unfortunate cases where the court was faced with dividing marital debts rather than marital assets.

regard to the debts, husband shall be responsible for all debts relating to Arrowhead Surveying in the approximate amount of $9,000. Wife shall be responsible for all debts associated with her business Blue Moon in the approximate amount of $9,000. [footnote omitted] . . . . Wife will be solely responsible for the debt to her parents in the amount of $22,000 . . . .

A trial court has an enormous amount of discretion in its division of marital property and its division is given great weight on appeal. *Dellinger v. Dellinger*, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997) (citing *Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987)). Moreover, the division of marital property need not be equal in order to be equitable. *Watters v. Watters*, 959 S.W.2d 585, 591 (Tenn. Ct. App. 1997). When allocating marital debt between the parties, the following four factors should be applied: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989); *Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003). After a thorough review of the record, we find that the trial court's overall debt division was inequitable in two respects.

The trial court declared that Husband would be responsible for the $9,000 debt associated with his business, Arrowhead Survey, and that Wife would be responsible for the $29,800 of debt associated with her business, Blue Moon, a dance and music school. The trial court noted, "While Wife indicates the total debt for Blue Moon to be $29,800, it appears that approximately $20,000 of this debt has been written off by Blue Moon creditors. Both parties testified there have been no attempts to collect this debt in over a year."

While $20,000 of the debt may have been "written off" by the creditors, such does not constitute a release of liability. Accordingly, while Wife may only be held liable for $9,000 of the debt, it is also possible that she may be held liable for the entire $29,800 of that debt. Such a consequence could render the allocation of the parties' debts inequitable. Therefore, each of them should be responsible for one-half of the additional indebtedness, if any, owed to Nashville Associates, arguably in the amount of $20,000.

Wife also contends that the trial court erred by allocating to Wife the debt of $22,000 owing to Bank of America. The trial court did not make any findings of fact to explain why it allocated the $22,000 Bank of America debt to Wife. It simply stated, "Wife shall be solely responsible for the debt to her parents in the amount of $22,000." When asked at trial how the $22,000 proceeds from the Bank of America loan were spent, Husband testified, "[T]he only reason Arrowhead taxes hadn't been paid is for the whole year she [Wife] kept the books she never took taxes out on Arrowhead so at the end of the year it all came due, but that money had paid her teachers, her rent, her everything else up to that point, so that money theoretically was not for Arrowhead taxes . . . ." Wife, however, contradicted Husband's testimony by testifying that the money was spent on Arrowhead's taxes.

Tenn. Code Ann. § 36-4-121(b)(1)(A) defines marital property as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing a complaint for divorce. . . ." Marital debts are debts incurred by either or both spouses during the marriage. *Alford v. Alford*, 120 S.W.3d at 812.

Arrowhead Survey and Blue Moon were both founded during the marriage and both parties contributed in a variety of capacities to "his" and "her" company. Moreover, Blue Moon was a corporation and the shares of stock were issued to Husband and Wife. The $22,000 Bank of America debt was incurred during the marriage. Admittedly, the evidence is contradicted and thus inconclusive whether Arrowhead or Blue Moon received a greater benefit from the loan, the preponderance of evidence suggests that both parties and both companies benefitted from the Bank of America loan. Thus, the evidence preponderates against holding Wife solely responsible for the Bank of America loan.[9] For these reasons, we find that each spouse should be liable for one-half of the $22,000 Bank of America loan.

Accordingly, we modify the allocation of debts attributable to Arrowhead Survey and Blue Moon as follows:

(1)     Husband and Wife shall each be liable for one-half of the $22,000 Bank of America debt,
(2)     Husband shall be solely liable for the approximately $9,000 debt attributable to Arrowhead Survey;
(3)     Wife shall be solely liable for that portion of the Blue Moon indebtedness that has not been written off, being approximately $9,000; and
(4)     Husband and Wife shall each be liable for one-half of the additional indebtedness, if any, owed by Blue Moon to Nashville Associates, arguably in the amount of $20,000.

### Attorney Fees

The final issue is Wife's assertion that the trial court erred by refusing to assess her attorney fees. In a divorce case such as this, attorney fees are treated as a form of spousal support. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Thus, when deciding whether an award of attorney fees is appropriate, the courts rely on the factors set forth in Tenn. Code Ann. § 36-5-101, such as the relative earning capacity and education of the parties, the length of the marriage, the parties' age and physical conditions, the relative fault of the parties and such other factors as are necessary to consider the equities between the parties.

---

[9]Wife's parents provided collateral to secure the Bank of America loan. That fact alone is insufficient to hold Wife liable for the loan. Moreover, the evidence clearly established that neither Husband nor Wife could qualify for such a loan without the collateral.

Wife asserts that she is entitled to payment of her attorney fees due to her financial condition, the debt resulting from this litigation and her belief that Husband is solely responsible for the demise of the marriage. We disagree. Both parties are saddled with more debts than assets. Both parties are healthy and young and able to work. Although Husband is in a better financial position than Wife, Wife is more educated, holding two college degrees. Awards of attorney fees are within the sound discretion of the trial court and will not be disturbed on appeal unless the evidence preponderates against the award. *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). The evidence does not preponderate against the trial court's finding that the parties should be responsible for their own attorney fees.

Both parties seek to recover attorney fees incurred on appeal. "The determination of whether to award attorney's fees for an appeal is within our discretion." *Harris v. Harris*, 83 S.W.3d 137, 141 (Tenn. Ct. App. 2001) (citing Tenn.Code Ann. § 36-5-103 (2000)). We see no reason to deviate from the trial court's determination that the parties should be responsible for their own attorney fees. Thus, the requests to assess fees incurred on appeal are denied.

This matter is remanded to the trial court for further proceedings consistent with this opinion. Costs of appeal are assessed against the parties equally.

_____
FRANK G. CLEMENT, JR., JUDGE