IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 9, 2008 Session

## SMITH COUNTY REGIONAL PLANNING COMMISSION v. HIWASSEE VILLAGE MOBILE HOME PARK, LLC

**Appeal from the Circuit Court for Smith County**
**No. 5013-W     John Wootten, Judge**

---

**No. M2007-02048-COA-R3-CV - Filed August 11, 2008**

---

County regional planning commission brought suit seeking civil penalties and injunctive relief against a mobile home park alleged to be in violation of a private act regulating mobile home parks in the county. The trial court found that the mobile home park was not protected by a grandfather provision and ordered injunctive relief to bring the mobile home park into compliance with the private act. We affirm the result reached by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and RICHARD H. DINKINS, J., joined.

Patrick Johnson, Nashville, Tennessee, for the appellant, Hiwassee Village Mobile Home Park, LLC.

Jacky O. Bellar and J. Branden Bellar, Carthage, Tennessee, for the appellee, Smith County Regional Planning Commission.

**OPINION**

**Facts**

The piece of property at issue in this case is located on Hiwassee Road in Smith County, Tennessee, outside the boundaries of any city or town. In May 1997, Ricky Sanders and two of his brothers bought the property for approximately $48,000. In November 1997, the two brothers quit claimed their interest in the property to Ricky Sanders, whose intention it was to establish a mobile home park on the property. When Mr. Sanders acquired the property, there were no mobile homes on it.

In July 1997, the Smith County Regional Planning Commission ("the planning commission") circulated to its members a proposed private act to regulate mobile home parks. At the planning commission's January 1998 meeting, Mr. Sanders presented the commission with his plan to establish a mobile home park on the Hiwassee Road property. According to the minutes from that meeting, Mr. Sanders was told by a planning commission staff representative that "to his knowledge the county had no regulations which govern the development of mobile home parks" and that "he did not think any regulations [adopted in the future] would be retroactively enforced." After hearing from various concerned citizens, the planning commission voted at its February 1998 meeting to approve and recommend to the county commission the proposed private act regarding mobile home parks. The private act was enacted by the Tennessee General Assembly and was ratified by the Smith County Commission on May 11, 1998. 1998 Tenn. Priv. Acts ch. 152.

Prior to May 11, 1998, the date when Private Chapter 152 took effect, Mr. Sanders was working to establish his mobile home park. His idea was to purchase and set up mobile homes for rental purposes. Mr. Sanders had a diagram drawn of the proposed mobile home park, Riverwood Mobile Home Park, which was to include 66 mobile home lots. Certificates of completion from the Department of Environment and Conservation show that the septic system construction for three lots was approved on December 17, 1997; additional lots were approved three at a time on January 9, 1998, February 11, 1998, February 23, 1998, and March 2, 1998, for a total of 15 septic systems.[1] On March 24, 1998, Mr. Sanders purchased ten new mobile homes for a total purchase price of approximately $98,000; he made a down payment of $10,000. On April 16, 1998, Mr. Sanders paid the balance of the purchase price. Mr. Sanders obtained electrical permits for thirteen lots in April 1998. Utility district records document computer entries on the following dates for water tap purchases by Mr. Sanders: three on November 11, 1997; three on May 15, 1998; one on June 15, 1998; one on July 15, 1998; one on October 19, 1998; and one on November 19, 1998. The utility district summary stated that the accounts would have been entered into the computer "one to two months later than when tap was actually purchased."

According to Mr. Sanders' testimony, delivery and installation of the ten new mobile homes began on or shortly after April 16, 1998. He also purchased four used mobile homes and had them installed. Mr. Sanders testified that he began renting lots in Riverwood in early April 1998. At that time, he stated, the lots did not have mobile homes on them, but they did have water, electricity, and septic tanks. He initially rented six lots. Mr. Sanders stated that rent was collected prior to May 11, 1998. Mr. Sanders stated that his first rentals moved in on May 30, 1998, and that he maintained the property as a mobile home park until June 1999 when he sold Riverwood to John and Christy Blackwell.[2]

---

[1] Although all of the certificates of completion are dated December 7, 1998, Mr. Sanders testified that the certificates were not issued until sometime after the actual installation of the septic systems.

[2] The Blackwells did not testify at the hearing.

Jody Pritchett, land use administrator and staff planner for the planning commission from January 2001 through July 2003, testified that he first saw Riverwood in January 2001. At that time, the park consisted of 35 to 40 mobile homes, which were situated close together. Mr. Pritchett observed that the park was in bad condition:

> There was sewage running down the driveway – or the road. Also, some of the access road into the mobile home park was kind of washed out. Some of the mobile home parks [sic] were not, at that time, being occupied and you could tell that they were going downhill pretty fast.

Mr. Pritchett did not see any administrative office on the property and did not see any signs of administrative control. He further observed: "There had been a fire or something and some of the trailers you could tell were – had been burned out and had – had not been removed from the – the property."

On January 1, 2001, the Blackwells filed for Chapter 11 bankruptcy. Mr. Pritchett returned to Riverwood in February and March 2001; on the latter visit, he observed that six new mobile homes had been added to the park. Mr. Pritchett sent Mr. Blackwell a notice of violation in March 2001, notifying him that his operation of the mobile home park was in violation of the private act. He testified that conditions at the park subsequently "just kept going downhill." Mr. Pritchett gave the following description:

> Things that kept getting worse was, of course, the sewage problem running down the street. Also, there – there wasn't a sense of who was controlling the mobile home park. We were having people come into the office telling us, you know, that things were going downhill, that people weren't paying rent, people were moving in trailers that they didn't own, things of that nature. Of course, we just referred them back to Mr. Blackwell for that.

According to Mr. Pritchett, most of the complaints were prompted by the residents' concern because they were not paying rent: "I think they were scared that they were going to lose their mobile homes, because they didn't actually know who owned the mobile home and they were concerned about that." Mr. Pritchett admitted on cross-examination that he did not have personal knowledge as to whether or not rent was being collected.

On January 31, 2002, a notice appeared in the local paper that a substitute trustee sale would be held on February 8, 2002, to satisfy the Blackwells' debt to the bank. At around this time, members of the planning commission inspected Riverwood. Billy Piper, a planning commission member, testified that the condition of the park was "awful." Mr. Piper testified: "There was sewer [sic] out on top of the ground. All of the – most all of the trailers had windows broken out of them, underpinning dropped out on them." He did not see any signs of control. The commission members talked to one woman who claimed to live at the park but did not see other residents. Glenn Pettross, another planning commission member, testified about the conditions he observed when he and others

visited the mobile home park in March 2002: "The roads was [sic] in bad shape, sewer [sic] running out on the roadsides, and the lots was growed up [sic] pretty bad and windows broke out. It just looked pretty bad." Mr. Pettross further stated that it appeared that the park "wasn't being taken care of at all." He did not see any improvement on subsequent visits.

The planning commission filed this action against the Blackwells and Mr. Sanders on February 6, 2002. The planning commission requested a civil penalty of $50.00 for each day that the defendants violated the private act, temporary and permanent injunctive relief to prevent the defendants from putting any more mobile homes on the property and temporary and permanent injunctive relief ordering the defendants to remove the mobile homes from the property.

On February 22, 2002, the Blackwells converted their Chapter 11 bankruptcy to a Chapter 7 bankruptcy. On June 10, 2002, the Blackwells were granted a discharge in the bankruptcy proceedings. On August 28, 2002, the bankruptcy filed a notice of abandonment concerning the Riverwood property. Earl North, a county commissioner, described the condition of the property after the foreclosure:

> Well, it had just got in terrible shape. It was septic tanks overflowing. There was people there that – very undesirable. . . . If people move in and move out, you wouldn't know who was doing what. It was total chaos for the whole community, actually.

Mr. North reported that numerous people have complained to him about the state of the mobile home park.

On June 11, 2004, the Riverwood property was transferred by quit claim deed from the Blackwells to Bruce Scott, who paid the bank for the property. In a letter to the planning commission in August 2005, Mr. Scott gave the following description of the property when he bought it:

> For two years the park has been totally ignored. All kind of people have come and gone as they pleased. People have moved in without any permission but no one cared. No one came around to collect rent[.] No one made the mobile home secure. When people moved they took refrigerators, stoves, heating systems, air conditioners and some even took the toilets. They piled up their garbage and trash, they broke out the windows it was just a mess.

> When the large number of mobile homes were pulled out they . . . left the metal anchors in the ground, the concrete blocks, sewer and electric pipes. The weeds and the briars grew almost as high as the mobile homes were tall.

-4-

At the hearing, Mr. Scott further stated:

> I had three separate sewer systems that were – had been broken, the lines going to the tanks. There were people living in the mobile homes that were not paying rent, did not take care of the property very well. They didn't – the garbage was piled up high. They used – there was a burnt mobile home, a burned-out mobile home, and next to it was kind of a gully, and the people would just throw their garbage in that, and it was all grown up.
>
> . . . .
>
> There was the foundations of numerous mobile homes that were not there, meaning that the blocks, the concrete blocks that support a mobile home, the anchors that hold the mobile home in place . . . were all in the ground and on top of the ground and mixed in the weeds and the briars to such an extent that we could not put a bush hog . . . on the property without the fear of tearing it up.

Mr. Scott testified that he began to clean up the property and operate the mobile home park.[3]

In November or December 2004, Kevin Rush, the director of the planning commission, went out to examine the Riverwood property. Mr. Rush gave the following testimony concerning the condition of the park at that time:

> It was run down. Most of the homes had windows that were broken out. There were very few electric meters, if any, on any of the trailers. It was overgrown. There was trash and garbage and rubbish everywhere. It was in a run-down shape.

When asked if the property was being used as mobile home park at that time, Mr. Rush testified:

> There were trailers there. I'm not sure if anybody was living at the park at that time. Like I said, most of the homes had windows broken out. They were in a dilapidated state. There was weeds and – and underbrush growing. There was, you know, trash and other debris scattered about. There were – I will say there were some mobile homes there.
>
> . . . .
>
> From the appearance, it did not look like it was livable.

Mr. Rush estimated that there were about twenty mobile homes on the property at that time. He issued a citation to Mr. Scott after his visit to the park. Mr. Scott thereafter made efforts to clean up the park.

---

[3]The planning commission filed an amended complaint on September 12, 2005 adding Mr. Scott as a defendant.

Mr. Scott sold the property in May 2006 to Hiwassee Mobile Home Park, LLC ("Hiwassee"), which was added as a defendant in August 2006; Hiwassee is the appellant in this action.[4]

The case was heard in a bench trial on July 12, 2007. In an order entered on August 16, 2007, the court entered judgment in favor of the planning commission. The court's order includes the following findings:

> [T]he subject property known as the "Hiwassee Village Mobile Home Park" was not grandfathered prior to passage of the Mobile Home Park Resolution by Smith County Private Act on May 11, 1998.
>
> The court makes specific findings that preparation and intent for a mobile home park had been made by Ricky Sanders prior to passage of the Private Act but [Hiwassee] failed to carry its burden of proof to show the mobile home park was in operation.
>
> Furthermore, the Court finds the Plaintiff, Smith County Regional Planning Commission, carried by clear and convincing evidence its burden of proof demonstrating the mobile home park was abandoned for a period beginning one (1) year prior to the date of the lawsuit in February, 2002, and continuing until the acquisition of the property by Bruce Scott, a predecessor in interest in Defendant's chain of title.

On appeal, Hiwassee argues that the trial court erred in its application of Tenn. Code Ann. § 13-7-208 to the facts of this case. Particularly, Hiwassee asserts that the trial court erred in finding that there was no mobile home park in operation prior to the effective date of the private act, in failing to apply Tenn. Code Ann. § 13-7-208(g) retroactively, and in finding that the Blackwells abandoned the mobile home park.

**Standard of Review**

The trial court's findings of fact are reviewed "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Our consideration of the preponderance of the evidence "is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice,* 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998). Review of a question of law is also de novo, but "'with no presumption of correctness afforded to the conclusions of the court below.'" *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002) (quoting *State v. McKnight*, 51 S.W.3d 559, 562 (Tenn. 2001)).

---

[4]On May 5, 2006, a voluntary dismissal was entered as to defendant Ricky Sanders. On July 6, 2007, summary judgment was granted as to defendant Bruce Scott.

**Analysis**

Applicability of Tenn. Code Ann. § 13-7-208

In their arguments on appeal, both parties operated under the assumption that Tenn. Code Ann. § 13-7-208 applies in the case. We have concluded, however, that this assumption is erroneous.

Tenn. Code Ann. § 13-7-208 addresses the application of local zoning ordinances to certain nonconforming uses and contains the "grandfather" provision at issue.[5] Subsection (b)(1) provides as follows:

> In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then **any industrial, commercial or business establishment in operation**, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.

Tenn. Code. Ann. § 13-7-208(b)(1) (emphasis added). The highlighted language limits the applicability of this grandfather provision to "industrial, commercial or business establishment[s]." Tenn. Code Ann. § 13-7-208(b)(1); *Bramblett v. Coffee County Planning Comm'n*, No. M2005-01517-COA-R3-CV, 2007 WL 187894, *9 (Tenn. Ct. App. Jan. 24, 2007). This court has previously stated that, "[i]n zoning parlance, use of real property for human habitation is generally classified as 'residential,' regardless of whether someone profits from it." *Bramblett*, 2007 WL 187894 at *9.

---

[5] A nonconforming use is "[a] use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated." 1 Kenneth H. Young, ANDERSON'S AMERICAN LAW OF ZONING § 6.01, 481-482 (4th ed. 1996 & Supp. 2008). A nonconforming use may be "grandfathered," and "thus exempt from restriction under the later zoning ordinance, when the use is specifically exempted from the ordinance's application on the ground that the property was being used that way when the ordinance took effect." *Bramblett v. Coffee County Planning Comm'n*, No. M2005-01517-COA-R3-CV, 2007 WL 187894, *4 n.12 (Tenn. Ct. App. Jan. 24, 2007) (citing *Town of Orono v. LaPointe*, 698 A.2d 1059, 1062 (Me. 1997) and Bryan A. Garner, DICTIONARY OF MODERN LEGAL USAGE 390 (2nd ed. 1995)).

The court in *Bramblett* concluded that a duplex constituted a residential use and that Tenn. Code Ann. § 13-7-208 did not confer grandfather protection. *Id.* In *City of Redbank v. Phillips*, No. E2006-02267-COA-R3-CV, 2007 WL 4460223, *5 (Tenn. Ct. App. Dec. 20, 2007), the court quoted *Bramblett* and concluded that a multi-family dwelling was a residential use, not protected by the grandfather provision of Tenn. Code Ann. § 13-7-208.[6]

Because the mobile home park is or was used for human habitation, the logical conclusion based upon the cases cited above is that it should be considered a residential use. This conclusion comports with the general inclination of courts in other jurisdictions to classify mobile home parks as residential in nature. 2 Kenneth H. Young, ANDERSON'S AMERICAN LAW OF ZONING §§ 14.01, 14.05, 708, 727 (4th ed. 1996 & Supp. 2008). We have determined, therefore, that the mobile home park at issue should be classified as a residential use and is not subject to the grandfather protection of Tenn. Code Ann. § 13-7-208(b)(1).

Nonconforming use

Since Tenn. Code Ann. § 13-7-208 does not apply in this case, this court must look to other authorities to decide the issues presented.

In other cases in which the court has determined that Tenn. Code Ann. § 13-7-208 was not applicable, the effect of a zoning ordinance on a nonconforming use has been determined by the provisions of the local zoning ordinance itself. *See Bramblett*, 2007 WL 187894 at *9; *City of Redbank*, 2007 WL 4460223 at *5. In this case, however, the private act does not address nonconforming uses and is not part of a general zoning ordinance.[7] We are, therefore, left to common law and constitutional principles to determine the proper application of the private act to the facts of this case.

Tennessee courts have recognized the constitutional implications of zoning ordinances that attempt to eliminate or restrict a property owner's use of his or her property as it exists at the time when the zoning restrictions take effect. *See Consol. Waste Sys., LLC v. Metro Gov't of Nashville and Davidson County*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860, *3 (Tenn. Ct. App. June 30, 2005); *Rives v. City of Clarksville*, 618 S.W.2d 502, 507-508 (Tenn. Ct. App. 1981). In a line of cases involving property owners who obtained a permit to use their property for a certain purpose prior to the enactment of a zoning ordinance prohibiting such use, the Tennessee Supreme Court set forth principles for determining whether a property owner had acquired a vested right to the permitted use. *See State ex rel. SCA Chem. Waste Servs. v. Konigsberg*, 636 S.W.2d 430, 437 (Tenn.

---

[6]Hiwassee cites the case of *Clouse v. Cook*, No. 87-68-I, 1998 WL 34834, *2 (Tenn. Apr. 18, 1988), in support of its contention that a mobile home park should be classified as a commercial or business use. The Supreme Court designated its opinion in *Clouse* as not for publication and not for citation pursuant to Tenn. S. Ct. R. 4. Based upon this designation, we do not consider that opinion to have precedential value beyond its application to the parties in that case.

[7]Smith County adopted a zoning ordinance in July 2003. When the private act took effect in May 1998, it appears that there was no zoning ordinance applicable to Smith County.

1982); *Schneider v. Lazarov*, 390 S.W.2d 197, 201 (Tenn. 1965); *Howe Realty Co. v. City of Nashville*, 141 S.W.2d 904, 906 (Tenn. 1940). In *Konigsberg*, the Court stated:

> [T]he relator is in no position to claim an estoppel or otherwise insist upon a vested right in the zoning regulations existing at the time it applied for the permit here sought; it had not begun construction nor even purchased the land upon which it proposed to build its plant. It is well settled that **rights under an existing ordinance do not vest until substantial construction or substantial liabilities are incurred relating directly to construction.**

*Konigsberg*, 636 S.W.2d at 437 (emphasis added). The "vested right" concept described in these cases is consistent with the general rule described in treatises and applied in other jurisdictions. 1 Young, *supra* §§ 6.05-6.06, 490-500; *Morgenstern v. Town of Rye*, 794 A.2d 782, 787 (N.H. 2002); *Dawe v. City of Scottsdale*, 581 P.2d 1136 (Ariz. 1978); *Sherman-Colonial Realty Corp. v. Goldsmith*, 230 A.2d 568, 572 (Conn. 1967).

The general principles of vested rights are similar to those applied in nonconforming use cases involving Tenn. Code Ann. § 13-7-208 and local zoning ordinance provisions. In *Dickson County v. Jennette*, No. M1999-00054-COA-R3-CV, 2000 WL 1121550, *1 (Tenn. Ct. App. Aug. 9, 2000), a 1998 zoning ordinance prohibited mining and quarrying on the property at issue without a special exception. The property owners argued that their property was used as a quarry before the ordinance took effect. *Jennette*, 2000 WL 1121550 at *1. Applying Tenn. Code Ann. § 13-7-208(b) and the local zoning ordinance, the court looked to determine whether the property was in fact being used as a quarry prior to the zoning resolution. *Id.* at *7-8. The court found that the property owners "intended such an operation [quarry] for the future and were working toward the same." *Id.* at *7. The court then stated: "[C]ourts uniformly agree that '[m]ere preparation for use of property before adoption of a zoning ordinance is not enough to show a devotion of the property to that use' in order to show a pre-existing nonconforming use." *Id.* (citing *City of Pharr v. Pena*, 853 S.W.2d 56, 64 (Tex. Ct. App. 1993)). After detailing the property owners' preparations for using the land as a quarry, the court set out one test for determining whether there had been enough use to constitute protection as a nonconforming use: "'an existing use should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose.'" *Id.* at *8 (quoting *City of Pharr*, 853 S.W.2d at 64). The evidence showed that no one, including the property owners themselves, considered the property to be used as a quarry business prior to the adoption of the ordinance. *Id.* The court concluded that the evidence did not preponderate against the trial court's finding that the property had not been used as a quarry prior to the ordinance's effective date. *Id.*

In *Rutherford v. Murray*, No. E2003-01333-COA-R3-CV, 2004 WL 1870066, *1 (Tenn. Ct. App. Aug. 20, 2004), this court affirmed the trial court's determination that the property owner was entitled to the protection of Tenn. Code Ann. § 13-7-203. The evidence did not preponderate against the trial court's finding that the property owner "started his [garage] business and was substantially working on his building before the change in zoning." *Rutherford*, 2004 WL 1870066

at *7. Finding *Jennette* distinguishable because of the "substantial steps" taken by the commercial garage owner before the zoning ordinance took effect, the court stated:

> "It is well settled that **rights under an existing ordinance do not vest until substantial construction or substantial liabilities are incurred relating directly to construction**." *State ex rel. SCA Chem. Waste Servs., Inc. v. Konigsberg*, 636 S.W.2d 430, 437 (Tenn. 1982). Defendant showed a devotion of the Property to use as an automobile repair shop prior to the change in the Zoning Regulations.

*Id.* at *8.

Thus, to establish a vested right to continue a pre-existing use, a property owner must engage in more than "mere preparation." *Jennette*, 2000 WL 1121550 at *7. The property owner must have performed "substantial construction" or incurred "substantial liabilities . . . relating directly to construction." *Konigsberg*, 636 S.W.2d at 437. The burden is on the property owner to prove his or her entitlement to protection as a nonconforming use. *See Lamar Adver. of Tennessee, Inc. v. City of Knoxville*, 905 S.W.2d 175, 176 (Tenn. Ct. App. 1995).

Applying these principles to the facts of this case, we have concluded that the trial court erred in finding that Hiwassee "failed to carry its burden of proof to show the mobile home park was in operation."[8] In his statements from the bench, the trial court made the following comments concerning the evidence:

> There's only one thing that I've seen here that has a dollar figure on it, and that has to do with the electrical permits. They are dated, it appears, 4/7/98, 4/8/98, all the way up to 4/24/98. . . . I see some dollar figures on here. There's a city/county permit fee of $3, total state fee of $19, and just looking at that, that's $22 times 13. That's about $286, if my math is good. That's the only dollar figure that I have. I've heard no proof about anymore in terms of the water taps or the subsurface sewage permits or the cost of those. So I see a lot of preparation. Indeed, I even see . . . the purchase of some homes for the purpose of renting. He did say that he had rented some lots in early April of 1998, but there is no proof of the receipt of any rentals or monies received, and so as I look at all the proof, including all of those exhibits and the testimony, particularly of Mr. Sanders who owned the property in question, I see, as I said a moment ago, a lot of preparation and intent to operate, but I don't see the existence of a mobile home park operating as that word should imply, an on-going business, full-time as of May 11, 1998. I struggle to see if there is such a business. I just can't see that, not by the proof that I've seen or by the weight of the evidence that I've seen.

---

[8]The parties agree that, if the mobile home park was in operation at the time when the private act took effect, and if it was not abandoned, the park's status as a nonconforming use transferred to those who owned the land after Mr. Sanders.

-10-

As the trial court noted, Mr. Sanders obtained water taps, electricity, and septic lines for the lots. The court identified only one specific dollar amount spent, $286 for electrical permits. While the court mentioned Mr. Sanders' purchase of mobile homes, the court did not add to the amount of money spent the amount that he spent for those mobile homes, approximately $98,000. Moreover, as the court noted, Mr. Sanders testified that he rented out some lots prior to the private act taking effect on May 11, 1998. The planning commission did not present any contradictory evidence, and the trial court did not question Mr. Sanders' credibility. It appears to this court that Mr. Sanders had taken substantial steps and, according to his undisputed testimony, had even begun collecting rent for the mobile home park lots prior to the effective date of the private act.

Because of the nature of a mobile home park, its construction does not necessarily involve the construction of buildings:

> The "construction" of a mobile home court . . . consists in the preparation of the land, the installation of utilities, and the construction of service buildings of various kinds. Commencement of the use may consist in activity which might be regarded as preparation for use in relation to a use which takes place in a substantial building.

2 Young, *supra* § 14.14, 756. Mr. Sanders did substantial work in preparing the site with electricity, water, and septic system and made substantial expenditures in obtaining the mobile homes. Under the circumstances, Mr. Sanders had established a pre-existing use of the property as a mobile home park. We find that the evidence preponderates against the trial court's finding that Mr. Sanders' efforts represented only preparations.

Our conclusion is consistent with cases in other jurisdictions involving mobile home parks as nonconforming uses. *Magness v. Caddo Parish Police Jury*, 318 So. 2d 117, 120 (La. Ct. App. 1975) (nonconforming use established: site cleared, plans drawn, water wells drilled, spaces for two or three mobile homes made available, serviced with electricity, septic tanks); *Perkins v. Joint City-County Planning Comm'n*, 480 S.W.2d 166, 168 (Ky. Ct. App. 1972) (nonconforming use established for combined project of converting motel to apartments and constructing trailer court: $10,000 spent on conversion of motel; negotations with engineers, contractors, utilities, etc. regarding development of mobile home park; $2,000 spent developing property); *Craig v. City of Lilburn*, 177 S.E.2d 75 (Ga. 1970) (retroactive application of zoning ordinance would be unconstitutional due to vested right in proposed mobile home park; property owner had made "substantial expenditures of time, effort and money," including grading, installing septic tank); *State ex rel. Howland Twp. Trustees v. Bailes*, 179 N.E.2d 527 (Ohio Ct. App. 1961) (nonconforming use established: two house trailers on property; electricity installed for five trailers; septic tanks installed for eight trailers; water lines installed); *Kessler v. Smith*, 142 N.E.2d 231, 233 (Ohio Ct. App. 1957) (nonconforming use established: owner expended substantial sum of money for work including the preparation of plans, digging a well, building a roadway, building a septic tank, grading the land, delivering concrete block for construction, and erecting a utility building); *cf. A & P Mobilehome Court, Inc. v. Town of Groton*, 154 A.2d 243, 247 (Conn. Super. Ct. 1959) (no nonconforming use established: engineer surveyed and planned mobile home park, trees and brush cleared from

roadways; no provisions for water, sewer, other utilities; no mobile homes on land); *Town of Wallingford v. Roberts*, 146 A.2d 588, 589 (Conn. 1958) (no nonconforming use established: five trailers were moved onto the property the day before ordinance took effect; trailers were not connected to electrical or plumbing facilities); *Town of Perinton v. Muzeka*, 141 N.Y.S.2d 607, 608 (N.Y. Sup. Ct. 1955) (no nonconforming use established: evidence failed to establish pre-existing use, particularly in light of bias of several of property owner's witnesses concerning events 15 to 19 years earlier); *Ohio State Student Trailer Park Coop. v. Franklin County*, 123 N.E.2d 286, 289 (Ohio Com. Pl. 1953), *aff'd,* 123 N.E.2d 542 (Ohio Ct. App. 1953) (no nonconforming use established: no actual work of constructing the trailer camp had started prior to zoning resolution); *City of Omaha v. Glissmann*, 39 N.W.2d 828, 833 (Neb. 1949) (no nonconforming use established when nearly all of the work done in preparing the property for use as a trailer camp or park was done after the zoning ordinance took effect).

Abandonment

The planning commission argues that, even if Hiwassee established a nonconforming use, use of the property as a campground was abandoned or discontinued, thereby negating Hiwassee's entitlement to protection from the private act's application.

As a general rule, grandfather protection for a nonconforming use exists only if the nonconforming use continued from the time the zoning ordinance became effective to the date of the alleged violation. 1 Young, *supra* § 6.65, 676; *see Lafferty v. City of Winchester*, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2000) (citing Tenn. Code Ann. § 13-7-208). If the nonconforming use is abandoned or discontinued, "the right to continue it as a nonconforming use is ended even though the controlling ordinance makes no specific provision with respect to abandonment or discontinuance of use." 1 Young, *supra* § 6.65, 676.

With respect to the issue of abandonment, the trial court found that "the mobile home park was abandoned for a period beginning one (1) year prior to the date of the lawsuit in February, 2002, and continuing until the acquisition of the property by Bruce Scott." The court also made the following statements at the hearing:

> Was this property abandoned in terms of its usage, its non-conforming usage under the Private Act? I think so. I truly believe, given the proof that I have seen from and heard from a couple of county commissioners, the zoning director, the two that have testified here, from even a predecessor in title, Mr. Scott, this property was just, in effect, gone in existence as a mobile home park. The fact that people happened to be there – and I heard different numbers. I think Mr. Scott said there was a lady living there. There might have been one or two people there. They seem a little more than trespassers to me. They've got the benefit of a free place to live and, apparently, no cost to them in terms of rent, taxes, nothing. The fact that they're there, the fact that there are trailers there, or mobile homes . . . does not necessarily mean it's a park, I don't think, and I think, given what I've heard from the previous

-12-

zoning director, Mr. Pritchett, when he came out there early on in his administration in 2001, that was the beginning of his acknowledgment that this place was abandoned, and it continued on all the way until the lawsuit was filed and even on until it was really acquired by Mr. Scott, which is, I think, well over three years later. It just got worse each passing day, notwithstanding the fact that there may or may not have been a resident there. By resident, I mean somebody just living there, not someone paying or contributing to the commerce of the home or the mobile home park, but just there, and so that extends, when you think of the totality of the proof I heard, over three years.

Since the present case is not governed by statute or by a county zoning ordinance, there is no definite period of time necessary to constitute abandonment.[9] The trial court concluded that "one year would be a reasonable period of time."

We find that the evidence does not preponderate against the trial court's conclusion that the mobile home park was abandoned. The evidence shows that, for more than one year, the Blackwells allowed the property to deteriorate to the point where there was no administrative control and people were living there without paying any rent.

Hiwassee argues that a finding of abandonment or discontinuance is improper because the Blackwells did not voluntarily abandon the mobile home park. In support of this argument, Hiwassee cites *Boles v. City of Chattanooga*, 892 S.W.2d 416, 423 (Tenn. Ct. App. 1994), a case in which the court concluded that an adult bookstore had not voluntarily discontinued its business when it had been ordered to do so by a temporary restraining order. Hiwassee relies on language in *Boles* to the effect that abandonment or discontinuance requires an element of intent. *Boles*, 892 S.W.2d at 422. In two subsequent cases, however, *Boles* has been interpreted in accordance with its actual holding. Thus, in *Toles v. City of Dyersburg*, 39 S.W.3d 138, 141 (Tenn. Ct. App. 2000), the court stated:

> We read *Boles* to support the proposition that "intent" is only important where some force outside the control of the property owner prevents the continued use of the land in a particular manner.

*See also Custom Land Dev., Inc. v. Town of Coopertown*, 168 S.W.3d 764, 774-775 (Tenn. Ct. App. 2004).

Hiwassee argues that, after the planning commission filed suit on February 2, 2002, and the Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy on February 22, 2002, the property was put under the control of the bankruptcy trustee and the Blackwells did not voluntarily abandon use of the property as a mobile home park. Even if we accept this reasoning, however, it does not

---

[9]Although the trial court was applying Tenn. Code Ann. § 13-7-208, the court ruled that subsection (g) establishing a 30-month period for abandonment should not be applied retroactively.

negate the trial court's conclusion that the property had been abandoned since January 2001 and that a year was a reasonable amount of time to constitute abandonment. There is no evidence to indicate that, during the year from January 2001 through February 2002, any force outside the Blackwells' control prevented them from continuing to use the property as a mobile home park. The trial court did not err in concluding that use of the property as a mobile home park was discontinued.

We affirm the decision of the trial court. Costs of the appeal are assessed against the appellant, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE